**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

ROBERT SIMON, JR.                                                    PETITIONER

V.                                                    CIVIL ACTION NO.: 2:04CV26-P

CHRISTOPHER EPPS, ET AL.                                                    RESPONDENTS

## MEMORANDUM OPINION

Petitioner Robert Simon, Jr. has filed this federal habeas corpus action pursuant to Title 28 U.S.C. § 2254, seeking to challenge his otherwise final State capital murder convictions and sentences of death.

## Factual Background and Procedural History[1]

On Friday evening , February 2, 1990, between 8:45 and 9:15 p.m., Carl and Bobbie Jo Parker, along with their children Charlotte and Gregory Parker, left Bible study at a church in Clarksdale, Mississippi and returned to their home on Highway 322 in Marks, Mississippi. Around 11:00 p.m., Billy King was driving by the Parker home when he noticed the home was on fire. After finding the smoke and flames too great to enter the Parker home, he continued to a neighbor's home to call for help. While he was waiting for the neighbor to contact the fire department, he saw two vehicles leave the driveway of the Parker home or the drive to the Parkers' shop. The same evening, Joe McCullough, headed east on Highway 322, met two speeding vehicles headed west, the first of which was a Chevrolet truck.

---

[1] The facts, though not an exact recitation, are primarily taken from the opinion of the Mississippi Supreme Court's factual summary on direct appeal. *See Simon v. State*, 688 So.2d 791 (Miss. 1997).

Jerry Wages, a member of the Lambert Volunteer Fire Department, arrived at the Parker's house and crawled into the home through an unlocked back door. Wages and other firefighters dragged the bodies of Carl Parker and Gregory Parker, each bound by hand and foot, from the home. On the morning of February 3, 1990, after the fire was extinguished, the body of Bobbie Jo Parker was discovered.

During the course of the investigation on Friday evening, it was discovered that Carl Parker's red Chevrolet Silverado truck was missing. A description of the truck was broadcast. Around midnight on Friday, Eddie Spralls, a Clarksdale resident, was drawn by noises to look out of his window, where he saw a red truck backing up between two abandoned houses. He called police, and when the authorities arrived and turned spotlights on the truck, two black men jumped from the vehicle and ran. The truck was filled with furniture and items later identified as belonging to the Parker family, and it was parked near the home of Robert Simon's mother-in-law. Near the truck, police officers also found a shotgun and a pillowcase containing two revolvers, a .38 caliber and a .32-20 caliber. It had rained heavily throughout the evening of February 2, 1990, so the truck and items were taken to a city garage to dry.

Coahoma County Sheriff, Andrew Thompson, Jr., testified at trial that he spoke with Martha Simon, Petitioner's wife, and that this conversation led to the recovery of a pair of gloves and a wet pair of coveralls that smelled of smoke. These items were found in a locked dumpster located near the home of Petitioner's mother-in-law. Based on this and other information, Petitioner and Anthony Carr were arrested around 3:30 p.m. on Saturday, February 3, 1990. Petitioner was read his *Miranda* rights and placed in the Clarksdale City Jail. The boots worn by Petitioner when he was arrested were later positively identified by Scott Parker, a son in the

Parker family, as boots he left at his family's home prior to leaving on a naval tour of duty.

Petitioner's wife gave authorities consent to search the couple's apartment in Memphis, Tennessee, where various items later identified by Carl Parker's sons, Dean and Scott Parker, as belonging to the Parker family were found. Among those items were a man's wedding ring, a woman's wedding ring, a money clip, a pellet gun, boots, and a notebook with "Mr. Parker" written in it. Petitioner was transferred to the Quitman County Jail on Monday, February 5, where Officer Dickerson read him his *Miranda* rights in the presence of Sheriff Harrison and Officer Ellis. All three officers testified later at trial that Petitioner stated he understood his rights, did not want an attorney, and that he indicated he had killed the Parker family. Petitioner stated he "preferred not to sign" a waiver of rights form. While at the Quitman County Jail, Petitioner was overheard talking to Carr, and he had conversations with other prisoners. At trial, testimony was admitted that Petitioner had admitted in these conversations that he killed the Parkers, that he was going to "take the heat," that they were not supposed to kill the Parkers but that his partner had "messed up," and that a timer device was set to burn the house an hour and a half after they left.

Petitioner moved to suppress his statement at a pretrial hearing, where he testified he did not voluntarily waive his rights. Petitioner stated he requested an attorney, though he could not identify the jailer to whom he made the request. Petitioner admitted to making statements to police officers, but he stated that he made most of the statement up because he was scared. Several other witnesses testified at the hearing, including prisoners housed at the jail at the time Petitioner was in custody, as well as his wife, Martha Simon. Petitioner's statement was determined to have been freely and voluntarily given and was later admitted at trial.

Petitioner was indicted and tried separately for the capital murder, sexual battery, and kidnapping of Charlotte Parker. The trial was moved to Jones County on Petitioner's motion for a change of venue. The jury was unable to unanimously decide on a sentence, and the trial court imposed a sentence of life imprisonment for the capital murder conviction and thirty years on each of the felony convictions. *See Simon v. State*, 679 So.2d 617 (Miss. 1996) ("*Simon I*"). Anthony Carr, Petitioner's co-felon, was indicted on four counts of capital murder and tried in September of 1990, with the trial resulting in a death sentence on each count. *See Carr v. State*, 655 So.2d 824 (Miss. 1995). Following Carr's trial, Petitioner was tried on a multi-count indictment of three counts of capital murder while acting in concert with another. He was indicted for: (1) the murder of Carl Parker with an underlying felony of robbery; (2) the murder of Gregory Parker with the underlying felony of kindapping; and (3) the murder of Bobbie Jo Parker with an underlying felony of burglary with the intent to steal. On October 8, 1990, Petitioner's trial began in the Circuit Court of DeSoto County, where it was transferred on a change of venue. The convictions and death sentences that followed the October 1990 trial are at issue in the instant petition.

At trial, Steve Byrd, a firearms expert, testified that the projectiles removed from the bodies of Carl and Gregory Parker had been fired from a .32-20 revolver, which was one of the caliber revolvers found in a pillowcase near Carl Parker's truck on the night of the murders. The projectile removed from Bobbie Jo Parker's body was fired either from the Colt .38 revolver found in the same location or from a revolver with the same characteristics. Winona resident, Mammie Elmore, identified the guns and Robert Simon, Jr., as one of the two men who stole the

guns from her approximately five days before the murders.  Pathologist Dr. Steven Hayne

testified at trial that Carl Parker suffered two contact gunshot wounds and bled to death as a

result.  He reported Carl's "ring" finger had been amputated post-mortem.  Gregory Parker

suffered various bruises and contusions, and he bled to death as a result of two gunshot wounds.

Bobbie Jo Parker's actual cause of death was a gunshot wound to the chest.   Following a finding

of guilt on all three counts, the jury heard evidence during the sentencing phase and sentences of

death were returned as to all three victims on October 14, 1990.

On February 9, 1995, the Mississippi Supreme Court affirmed all three convictions and

death sentences.  The court denied Petitioner's motion for rehearing, withdrew its previous

opinion, and substituted it with a new opinion.  *See Simon v. State*, 688 So.2d 791 (Miss. 1997)

("*Simon II*"), *cert. denied*, 521 U.S. 1126, 117 S.Ct. 2524, 138 L.Ed.2d 1025 (1997).   On April

2, 1998, Petitioner filed a pro se application with the Mississippi Supreme Court, seeking post-

conviction relief.  On February 11, 1999, the Mississippi Supreme Court remanded the case to

the circuit court so that counsel could be appointed to assist Petitioner with his post-conviction

proceedings.  Following the filing of a second application, an amended application, and with

consideration of the State's response, the Mississippi Supreme Court denied relief on all grounds

on September 18, 2003, and denied a later motion for rehearing.  *See Simon v. State*, 857 So.2d

668 (Miss. 2003) ("*Simon III*").  On February 4, 2004, Petitioner filed a petition for writ of

certiorari with the United States Supreme Court attacking the post-conviction decision, which

the Supreme Court denied on April 5, 2004. *See Simon v. Mississippi*, 541 U.S. 977, 124 S.Ct.

1885, 158 L.Ed.2d 475 (2004).   Petitioner filed the instant petition[2] on January 27, 2004, raising

---

[2] Docket entry no. 1.

the following claims of error:

A.     THE TRIAL OF THIS CAUSE IN DESOTO COUNTY VIOLATED ROBERT SIMON'S RIGHTS SECURED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO BE TRIED IN THE JURISDICTION WHERE THE ALLEGED OFFENSE OCCURRED.

B.     BECAUSE DESOTO COUNTY HAD BEEN SATURATED BY OVERWHELMINGLY PREJUDICIAL COVERAGE OF THE CRIME AND CONCERNING ROBERT SIMON, PRECISELY THE SAME COVERAGE AS QUITMAN COUNTY, THE TRANSFER TO DESOTO COUNTY COMBINED WITH TRIAL COURT RESTRICTIONS ON VOIR DIRE AND REJECTION OF CHALLENGES OF JURORS VIOLATED ROBERT SIMON'S RIGHTS TO A FAIR TRIAL AND DUE PROCESS SECURED BY THE SIXTH AND FOURTEENTH AMENDMENTS.

C.     ROBERT SIMON'S COUNSEL WAS INEFFECTIVE DURING JURY SELECTION BY HIS FAILURE TO SEEK CHALLENGES BASED UPON PROSECUTORIAL MISCONDUCT RELATING TO PUBLICITY AND FOR HIS FAILURE TO ADEQUATELY QUESTION THE JURY PANEL MEMBERS ABOUT THEIR VIEWS OF THE DEATH PENALTY.

D.     THE PROSECUTION IMPROPERLY STRUCK BLACK PANEL MEMBERS FROM THE JURY USING BOTH SPURIOUS RATIONALES FOR HIS EXERCISE OF PEREMPTORY CHALLENGES AND USE OF SPURIOUS CHALLENGES FOR CAUSE.

E.     THE TRANSFER OF THE CAUSE FROM QUITMAN COUNTY TO DESOTO COUNTY, GIVEN THE RACIAL DEMOGRAPHICS, COMBINED WITH THE OTHER ASPECTS OF THE CASE REGARDING RACE - THE PROSECUTION'S USE OF SPURIOUS CAUSE AND PEREMPTORY CHALLENGES TO STRIKE BLACKS - TO VIOLATE ROBERT SIMON'S EQUAL PROTECTION RIGHTS SECURED BY THE FOURTEENTH AMENDMENT.

F.     A STATEMENT BY ROBERT SIMON WAS OBTAINED AND WRONGFULLY ADMITTED OVER OBJECTION IN VIOLATION OF SIMON'S FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS, IN THAT IT WAS OBTAINED THROUGH COERCION, WITHOUT MIRANDA WAIVERS, AND AFTER AN UNREASONABLE DELAY IN TAKING SIMON BEFORE A DETACHED MAGISTRATE AND APPOINTING COUNSEL.

G.     ROBERT SIMON'S COUNSEL WAS INEFFECTIVE IN HIS CONDUCT OF THE GUILT PHASE OF THE TRIAL, SPECIFICALLY HIS DEFICIENT EFFORTS TO

CHALLENGE STATEMENTS ROBERT SIMON HAD MADE TO LAW ENFORCEMENT OFFICERS.

H.     ROBERT SIMON'S COUNSEL WAS INEFFECTIVE IN HIS CONDUCT OF THE GUILT PHASE OF THE TRIAL, SPECIFICALLY BY FAILING TO CHALLENGE IMPORTANT ASPECTS OF THE PROSECUTION'S CASE.

I.     THE PROSECUTION FAILED TO DISCLOSE BRADY MATERIAL BY FAILING TO DISCLOSE THAT OFFICER THOMAS, A KEY PROSECUTION WITNESS AND LAW ENFORCEMENT OFFICER, HAD MATERIALLY CHANGED HIS TESTIMONY.

J.     ROBERT SIMON'S COUNSEL WAS INEFFECTIVE IN HIS CONDUCT OF THE INVESTIGATION FOR ROBERT SIMON'S DEFENSE, SPECIFICALLY IN FAILING TO MAKE AN INVESTIGATION OF SIMON'S FAMILY BACKGROUND.

K.     ROBERT SIMON'S COUNSEL WAS INEFFECTIVE IN HIS CONDUCT OF HIS INVESTIGATION FOR ROBERT SIMON'S DEFENSE, SPECIFICALLY IN RETAINING A CONFLICTED EXPERT, DEPENDING ON THAT EXPERT'S INVESTIGATION, AND THEREBY FAILING TO DEVELOP SUBSTANTIAL EVIDENCE IN MITIGATION RELATING TO SIMON'S ALLEGED COFELON.

L.     BECAUSE TRIAL COUNSEL MOVED TO RETAIN AN EXPERT WITH A CONFLICT OF INTEREST - THE EXPERT WAS ALREADY SERVING AS THE EXPERT FOR ROBERT SIMON'S ALLEGED COFELON, AND HELD OPINIONS AND DUTIES OF LOYALTY THAT CONFLICTED WITH SIMON'S INTEREST - SIMON WAS DENIED THE ASSISTANCE OF AN EXPERT AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

M.     THE TRIAL COURT VIOLATED ROBERT SIMON'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS BY FAILING TO CONDUCT AND PREVENTING TRIAL COUNSEL FROM CONDUCTING VOIR DIRE OF PROSPECTIVE JURORS EXPRESSING RELUCTANCE TO IMPOSE THE DEATH PENALTY SUFFICIENT TO DETERMINE WHETHER THEIR VIEWS WOULD PREVENT OR SUBSTANTIALLY IMPAIR THE PERFORMANCE OF THEIR DUTIES AS JURORS IN ACCORDANCE WITH THE COURT'S INSTRUCTIONS AND THEIR OATH.

N.     IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS, THE PROSECUTION WAS ALLOWED TO PUT INTO EVIDENCE, THROUGH A LAST MINUTE "SURPRISE" WITNESS, PURPORTED OTHER CRIME EVIDENCE RELATING TO A BURGLARY IN A PRIOR MONTH IN A TOWN AT SOME DISTANCE FROM THAT WHERE THE MURDERS OCCURRED.

O.     THE JURY INSTRUCTION ON LESSER-INCLUDED OFFENSE IMPROPERLY

DISCOURAGED JURORS FROM CONSIDERING LESS-INCLUDED OPTIONS, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.

P.     THE "HEINOUS, ATROCIOUS OR CRUEL" INSTRUCTION GIVEN TO THE JURY WAS OVERLY BROAD AND UNDULY VAGUE IN VIOLATION OF ROBERT SIMON'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

Q.     THE SENTENCING INSTRUCTIONS, BY REPEATEDLY REQUIRING UNANIMOUS FINDINGS, YET FAILING TO INSTRUCT THE JURY THAT IT WAS NOT REQUIRED TO UNANIMOUSLY FIND MITIGATING CIRCUMSTANCES, HAD THE EFFECT OF REQUIRING THAT ALL JURORS AGREE ON THE EXISTENCE OF A MITIGATING CIRCUMSTANCE BEFORE ANY JUROR COULD GIVE IT EFFECT IN VIOLATION OF ROBERT SIMON'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.

R.     THE COMBINED EFFECT OF THE REPEATED INTRODUCTION OF GRUESOME PHOTOGRAPHS AND AN EMOTIONAL DISPLAY BY A FAMILY MEMBER OF THE VICTIMS COMBINED TO DEPRIVE SIMON OF HIS RIGHTS TO DUE PROCESS AND TO A RELIABLE SENTENCING DETERMINATION AS SECURED BY THE EIGHTH AND FOURTEENTH AMENDMENTS.

S.     IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS, THE TRIAL COURT REFUSED TO INSTRUCT THE JURY ON A STATUTORY MITIGATING CIRCUMSTANCE FOR WHICH THERE WAS EVIDENTIARY SUPPORT, ROBERT SIMON'S LACK OF A SUBSTANTIAL PRIOR CRIMINAL HISTORY.

T.     THE COMBINED EFFECT OF THE REPEATED INTRODUCTION OF GRUESOME PHOTOGRAPHS AND AN EMOTIONAL DISPLAY BY A FAMILY MEMBER OF THE VICTIMS COMBINED TO DEPRIVE SIMON OF HIS RIGHTS TO DUE PROCESS AND TO A RELIABLE SENTENCING DETERMINATION AS SECURED BY THE EIGHTH AND FOURTEENTH AMENDMENTS.[3]

---

[3] The Court notes that this exactly the same ground as was raised in Ground R of the petition.  When the Court began its review of the petition, it found page 52 missing, which contained "Ground R."  The Court contacted Petitioner's counsel to determine whether he could supplement the petition with the missing page, and counsel provided a page which did not match with the filed document.  The Court concluded counsel had altered his copy of the document since filing it with the Court and encouraged counsel to review the filed petition in order to determine what ground was initially designated as "Ground R."  Counsel subsequently provided the Court with page 52, which contained this claim.  The petition contained references to the previous State briefs and opinions, but it did not provide any specificity from which the Court could glean Petitioner's argument.  In an effort to ensure the Court considered the petition in its

U.     ROBERT SIMON, JR. WAS DENIED HIS RIGHTS GUARANTEED BY THE FIRST, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS DUE TO IMPROPER PROSECUTORIAL ARGUMENT URGING THE JURORS TO RELY UPON THE BIBLICAL TEACHINGS AND GOD'S LAW IN SENTENCING ROBERT SIMON TO DEATH.

V.     OTHER PROSECUTORIAL ARGUMENTS AND COMMENTS DURING THE SENTENCING PHASE CLOSING STATEMENTS VIOLATED ROBERT SIMON'S FIFTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND MISINFORMED AND MISDIRECTED THE JURORS ON THE LAW.

W.     ROBERT SIMON WAS SUBJECTED TO THE DEATH PENALTY IN TWO SEPARATE TRIALS FOR THE SAME CONDUCT, IN VIOLATION OF THE PROHIBITION AGAINST DOUBLE JEOPARDY EMBODIED IN THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

X.     ROBERT SIMON WAS RETRIED AND A DEATH PENALTY SOUGHT AND OBTAINED FOR CONDUCT FOR WHICH HE HAD BEEN GIVEN A LIFE SENTENCE, IN VIOLATION OF THE PRINCIPLES OF COLLATERAL ESTOPPEL THAT ARE ALSO A PART OF THE PROHIBITION AGAINST DOUBLE JEOPARDY EMBODIED IN THE FIFTH AMENDMENT AND SECURED BY THE FIFTH AND FOURTEENTH AMENDMENTS.

Y.     THE CUMULATIVE EFFECT OF ROBERT SIMON'S COUNSEL'S INEFFECTIVENESS, THE FAILURE TO OBTAIN A DEFENSE EXPERT OR TO PROVIDE ANY CASE IN MITIGATION COMBINED WITH OTHER ERRORS OF COUNSEL ARE SO GREAT AS TO COMPEL IN THE AGGREGATE A CONCLUSION THAT HIS COUNSEL WAS INEFFECTIVE.

Though all of Petitioner's claims have been considered by the Court, the claims have

been renumbered and some have been consolidated for the sake of convenience.

## Applicable Standard

This petition is governed by the provisions of the Antiterrorism and Effective Death

---

entirety, the Court ordered Petitioner to file a memorandum of authorities in support of the petition addressing each and every claim in the petition. Petitioner's counsel filed a memorandum focusing on trial counsel's ineffectiveness without addressing each claim of error by its original designation. Therefore, the Court must assume Petitioner unintentionally duplicated this ground for relief.

Penalty Act ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 324-26, 117 S.Ct. 2059, 2062-63, 138 L.Ed.2d 481 (1997) (AEDPA applies to all federal habeas applications filed on or after April 24, 1996).  Pursuant to the AEDPA's scope of review, habeas corpus relief cannot be granted in connection with any claim adjudicated on the merits in State court proceedings unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the presented evidence.  *See* 28 U.S.C. § 2254(d); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).  The factual findings of the state court are presumed correct, and Petitioner bears the burden of rebutting the presumption by clear and convincing evidence.  *See Schriro v. Landrigan*, ___ U.S.___, 127 S.Ct. 1933, 1939-40, 167 L.Ed.2d 836 (2007); *Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005); 28 U.S.C. § 2254(e)(1).

Questions of law and mixed questions of law and fact are reviewed under the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d).  *See Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  These  clauses have been held to have independent meanings. *See, e.g., Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Federal habeas relief may be granted under the "contrary to" clause where the State court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 1519-20, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the State court applies the correct legal principle to the facts in an unreasonable manner.  *See id.* at 407-

08, 120 S.Ct. at 1520; *see also Brown v. Payton*, 544 U.S.133, 141, 125 S.Ct. 1432, 1439, 161 L.Ed.2d 334 (2005). Whether a decision is "unreasonable" is an objective inquiry, and it does not turn on whether the decision is merely incorrect. *See Schriro*, ___ U.S.at ___, 127 S.Ct. at 1939; *Williams,* 529 U.S. at 410-11, 120 S.Ct. at 1522; *Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004) (habeas relief merited where state decision both incorrect and objectively unreasonable).

Habeas relief does not generally lie for rules of constitutional law which have not been announced or that were announced after the challenged conviction became final on direct review. *See Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989). A new rule is not retroactively applied unless the United States Supreme Court holds the rule to be retroactive. *Tyler v. Cain*, 533 U.S. 656, 663, 121 S.Ct. 2478, 2482, 150 L.Ed.2d 632 (2001). It is a violation of the principles of *Teague* for a federal court to create new constitutional rules on habeas review. *See Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001).

Claims that were held procedurally barred during state court review on independent and adequate state law grounds are likewise generally barred from federal review. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729-30, 111 S.Ct. 2546, 2254, 115 L.Ed.2d 640 (1991) ("The doctrine applies to bar federal habeas claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests upon independent and adequate state procedural grounds."). In order to receive review of these defaulted claims, Petitioner must demonstrate "'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Id.* at 749-50, 111 S.Ct. at 2564-65 (internal citations omitted). If the state court has

imposed a bar to a claim and addressed the merits in the alternative, the procedural bar is not

vitiated. *See Harris v. Reed*, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 1044, 103 L.Ed.2d 308

(1989).

The AEDPA imposes the burden of obtaining an evidentiary hearing in federal court on

the petitioner, and it also limits the circumstances in which an evidentiary hearing may be

granted for those petitioners who fail to diligently seek to establish the factual bases for their

claims in state court. *See Williams*, 529 U.S. at 433-34, 120 S.Ct. at 1489 (prisoners at fault for

deficiency in state court record must satisfy heightened standard to obtain evidentiary hearing);

*Clark v. Johnson*, 202 F.3d 760, 765-66 (5th Cir. 2000), *cert. denied*, 531 U.S. 831 (2000);

*McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998); 28 U.S.C. § 2254(e)(2).   Even

where an evidentiary hearing is not precluded due to a petitioner's lack of diligence, the decision

to grant an evidentiary hearing is discretionary.  *See, e.g., Clark,* 202 F.3d at 765-66.  In order to

receive an evidentiary hearing in federal court, a petitioner must demonstrate that he was denied

a "full and fair hearing" in State court and persuade the Court that his allegations, if true, would

warrant relief.  *Id.* at 766 (citations omitted).

## Filings in this Court

In its preliminary review of the petition filed in this cause, the Court found that the

pleading did not fully apprise the Court of the arguments raised.  The petition incorporated by

reference both the brief filed on direct appeal and the amended petition filed during Petitioner's

State post-conviction proceedings.  On January 31, 2007, the Court ordered Petitioner to file a

memorandum of authorities fully addressing each ground raised in the petition.  Following the

grant of two extensions of time, Petitioner filed a memorandum in support of his petition on

April 19, 2007, in which he failed to brief grounds A, E, N, P, Q, R, and T.  Petitioner seeks to

have this Court incorporate by reference the arguments and authorities he relied upon in his briefs filed during appeal and State post-conviction proceedings. Respondents assert that Petitioner has waived the claims for purposes of federal habeas review. (*See* R. Memo 136). While the claims Petitioner has failed to brief will not be dismissed outright, the Court notes it is not the province of this Court to make an argument for Petitioner's claims. It is with the applicable standard of review in mind that the Court considers the following claims.

## I. Ineffective Assistance of Counsel

The standard for determining whether a criminal defendant has been denied his constitutionally guaranteed right to the effective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). A defendant seeking to reverse his conviction or sentence of death by claiming his counsel's performance was so ineffective as to deny him the right to counsel must satisfy a two-pronged test. First, Petitioner must show counsel's performance was deficient, which is accomplished by demonstrating counsel's errors were so egregious or serious that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment. *Id.* at 688, 104 S.Ct. at 2064. In order to demonstrate deficiency, Petitioner must show that the representation he received "fell below an objective standard of reasonableness." *Id.* Courts scrutinize counsel's performance while considering counsel's conduct from counsel's perspective at the time of the challenged behavior and without engaging in "hindsight" analysis of the conduct. *See Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 2536, 167 L.Ed.2d 471 (2003); *Bell*, 535 U.S. at 698, 122 S.Ct. at 1852, *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*, ___ U.S. ___, 127 S.Ct. 1909, 167 L.Ed.2d 568 (2007). Counsel is presumed to have given competent assistance, and Petitioner must overcome that presumption by demonstrating counsel's actions

were not within the province a reasonable trial strategy.  *See Strickland*, 466 U.S. at 689, 104

S.Ct. at 2065.  Second, Petitioner must demonstrate that he was prejudiced by counsel's conduct.

In order to demonstrate prejudice, Petitioner must establish a reasonable probability that, but for

the unreasonable conduct of counsel, the result of the proceeding would have been different.

*Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.  A "reasonable probability" is one which

sufficiently undermines confidence in the outcome of the proceedings.  *Id.*

Petitioner bears the burden of proving both the "deficiency" and "prejudice" prongs of

*Strickland* by a preponderance of the evidence.  *See Montoya v. Johnson*, 226 F.3d 399, 408 (5th

Cir. 2000), *cert. denied*, 522 U.S.1067, 121 S.Ct. 2220, 150 L.Ed.2d 212 (2001).  Both prongs

must be satisfied or it cannot be said that the adversarial process was so lacking that it rendered

an unreliable result, thereby denying Petitioner a fair trial.  *See Strickland*, 466 U.S. at 687, 104

S.Ct. at 2064.

A.  *Challenges Based on Prosecutorial Misconduct & Voir Dire Regarding Death Penalty Views*

Petitioner asserts defense counsel rendered ineffective assistance of counsel when he

failed to assert a prosecutorial concession that potential jurors who had been exposed to pretrial

publicity should be excused from the venire.[4]   (Pet. 19-22).  A hearing was held on allegations

of prosecutorial misconduct after the prosecutor gave statements and information to the media in

violation of professional and circuit practice rules.  (Pet. 20).  In a hearing on the issue of pretrial

publicity, the trial court determined it could not remove the prosecutor from the case or vary the

---

[4] Petitioner asserts the prosecutor held a press conference the day after Petitioner's arrest announcing a link between Petitioner and the crime. Subsequently, the prosecutor filed a motion containing false information about Petitioner and his co-felon, Anthony Carr.  Petitioner asserts that in a civil case related to the incidents, the court found that there had been violations of the Mississippi Rules of Professional Conduct and the Mississippi Uniform Rules of Circuit Court Practice.  (Pet.19- 20).

rule-based provision for peremptory challenges in order to remedy the violations, and Petitioner asserts that the prosecutor conceded at the hearing that challenges for cause for those potential jurors aware of the publicity was appropriate. (Pet. 21). Petitioner maintains that his defense counsel later failed to assert the concession when jurors exposed to pretrial publicity were not excused for cause, resulting in a jury where half of the seated jurors had been exposed to prejudicial pretrial publicity.[5] Petitioner maintains that defense counsel had to use half of his peremptory challenges just to remove these prejudiced jurors.[6] (Pet. 22).

Respondents first assert that Petitioner's argument that counsel was ineffective in failing to seek cause challenges is a misstatement of what happened prior to trial and at jury selection. (R. Memo 96-97). Respondents note that the same facts were addressed in *Carr v. State*, 655 So.2d 824, 840-42 (Miss. 1995), where the Mississippi Supreme Court held the pretrial publicity issue to be harmless error, as the trial court's remedy of a change of venue was correct. *Id.* Petitioner raised this issue on direct appeal, and the Mississippi Supreme Court found the underlying issue of juror impartiality in light of the prejudicial pretrial publicity to be without merit as the jurors stated they could be fair and impartial. *See Simon II*, 688 So.2d at 805. Respondents argue that since the underlying claim was without merit there is no ineffective assistance of counsel.

Respondents assert that both the prosecutor and trial judge applied the correct legal standard when determining whether jurors exposed to pretrial publicity should be excused, as

---

[5] Petitioner asserts that jurors (1) Kilgore; (2) Elder; (3) Clutter; (4) Robinson; and (5) Moore had read articles and/or seen news accounts of the crime prior to trial.

[6] Petitioner argues these peremptory challenges were used against potential jurors: (1) Thomas Baldridge; (2) Thomas Vanderslice; (3) Andrew Wilkes; (4) James Wages; (5) Jerry Green; and (6) Zingara Wilbanks.

"[t]he linchpin is whether the venire members stated that they could be fair and impartial jurors if chosen." *Simon II*, 688 So.2d at 804. Respondents maintain that each juror mentioned in the instant petition was questioned individually about their ability to be fair and impartial. (R. Memo 99). Respondents note that each of the jurors was accepted by defense counsel with peremptory challenges remaining. (R. Memo 99). Respondents also contend that the trial judge correctly concluded that the remedy for the prosecutor's actions lay in a change of venue and the seating of an impartial jury. (R. Memo 100). Moreover, Respondents note that Petitioner's argument that he had to use peremptory challenges to remove jurors who had been exposed to pretrial publicity is without basis in federal law. (R. Memo 100). Respondents conclude that defense counsel followed the law and rendered effective assistance in challenging the jurors, such that the decision of the court was not an unreasonable application of *Strickland*. (R. Memo 100).

The Mississippi Supreme Court considered this argument in its review of Petitioner's application for post-conviction relief. The court noted the trial court's consideration of defense counsel's motion to dismiss the case in light of the public dissemination of statements and evidence concerning the case. *Simon III*, 857 So.2d at 691. The relevant portion of the record is as follows:

> BY THE COURT: And, I believe you suggested in your brief that if we go to another county, and if we find any juror during voir dire that the pre-trial publicity has reached, that juror should be excused for cause. That's what your brief says.
> BY MR. LARRY LEWIS: Your Honor, of course - -
> BY THE COURT: - - And otherwise, so we may go to two or three counties.
> BY MR. LARRY LEWIS: Your Honor, if that juror when questioned on voir dire says that that juror has been contaminated with the virus and cannot lay aside anything that that juror may have heard or read, and has formed an opinion, well, certainly, that juror would have to be excused. And, if that juror - -

BY THE COURT:  - - That's the normal thing.  What remedial measures do we have because of this, regardless of how it came about?  I'm asking counsel for both sides.  What is the remedy, because it is out, because all these things through these filings of these two responses, which should never have been. (Trial Supp. Vol. 6, 651).

The court determined that the prosecutor made a concession that jurors tainted by pretrial publicity should be excused, but that the statement in context demonstrates the State was emphasizing the "for cause" standard used by trial courts to strike jurors.  *Id.* at 691-92.   The court stated that "[e]ach of the jurors in question indicated that they could put aside any conclusions they had formed about their exposure to the publicity in this case and be fair and impartial during the trial.  They failed to meet the standard required to dismiss them 'for cause.'"  *Id.* at 692 (internal citations omitted).   The court determined that defense counsel "was not deficient for failing to remind the trial judge of a non-binding and unenforceable concession made by the State in the course of discussing options to remove the taint of pretrial publicity from the trial jurors.  Counsel unsuccessfully moved to strike each of these jurors 'for cause.'  Thus, counsel was not deficient. . .".  *Id.*  The court noted that the record did not reveal any grounds to exclude the jurors, thereby leading to the conclusion that defense counsel's decision not to use available peremptory challenges to strike these jurors was a strategic one.  *Id.*

Defense counsel challenged approximately twenty-six jurors at least partially on the basis of their exposure to pretrial publicity.[7]  At least eight of these jurors were removed during challenges for cause on the basis that they could not be fair and impartial during the

---

[7] The defense challenged potential jurors: Mr. Baldridge, Ms. Leslie, Mr. Wilkes, Ms. Jones, Ms. Kilgore, Mr. Vanderslice, Ms. Elder, Mr. Williams, Ms. Clutter, Mr. Green, Ms. Robinson, Ms. Womack, Ms. Duncan, Ms. Sexton, Mr. Moore, Ms. Moore, Ms. Wilbanks, Ms. Clark, Mr. Siler, Ms. Smith, Mr. Bryant, Ms. Land, Ms. Brooks, Mr. Brannon, Mr. Osborne, and Mr. Vansickle. *See* Trial Tr. Vol. 11, 987-1019.

proceedings.[8]  Each of the other jurors challenged on the basis of pretrial publicity stated they could function as a fair and impartial juror and render a decision on the evidence presented. (*See* Trial Tr. Vol. 10, 841- 869).

With regard to Petitioner's argument that jurors tainted by pretrial publicity were seated on the jury, the Court finds the argument without merit.  The transcript of the pretrial hearing makes it clear that the prosecutor was merely asserting that those jurors tainted by pretrial publicity should be removed for cause.   Trial counsel was not deficient in failing to remind the trial court that the prosecutor knew the standard for removing jurors for cause.  The Court also finds no prejudice as a result of defense counsel's actions.  The issue is whether the jury that sat was impartial.  There is no indication that the seated jurors were not impartial, and the fact that Petitioner may have had to use peremptory challenges to remove jurors he did not want seated on the jury does not entitle him to relief.  *See Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) ("So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.").

Petitioner also asserts that defense counsel rendered ineffective assistance when he abandoned the process of questioning jurors about their views of the death penalty after the trial court sustained the prosecution's objection to defense counsel's repeated questioning on the subject.  (Pet. 22-23).  Specifically, Petitioner asserts that venire member Diane Etheridge

---

[8] Potential jurors (1) Jones (Trial Tr. Vol 11, 995); (2) Womack (Trial Tr. Vol. 11, 999); (3) Moore (Trial Tr. Vol. 11, 1003); (4) Smith (Trial Tr. Vol. 11, 1013); (5) Land (Trial Tr. Vol. 11, 1014); (6) Williams (Trial Tr. Vol. 11, 1013; (7) Barbour (Trial Tr. Vol. 11, 1013); and (8) Wilson (Trial Tr. Vol. 11, 1013) were excused for cause on the basis of their inability to be fair and impartial due to exposure to some form of pretrial publicity.

18

"stated that she could follow the judge's instructions and decide guilt without reference to the death penalty." (Pet. 22). Petitioner argues that Etheridge was improperly excused for cause in spite of her assurance that she could follow the court's instructions. (Pet. 23). Petitioner contends defense counsel did not seek to clarify her answers, and that he thereafter allowed partially rehabilitated jurors to be excused based on the prosecution's challenges for cause.[9] (Pet. 23).

Petitioner maintains that when defense counsel began his challenges for cause, the prosecution was given the opportunity to attempt to rehabilitate jurors who had indicated they would automatically impose a sentence of death upon a finding of guilt as to capital murder. (Pet. 23). Petitioner asserts his counsel rendered ineffective assistance by (1) failing to object when his opportunity at rehabilitation was cut-off; (2) failing to raise the issue with the trial court when it stated he had only partially rehabilitated the jurors; and (3) failing to raise the fact when the prosecution was given additional opportunity for rehabilitation. (Pet. 23-24).

Respondents argue that trial counsel did not abandon questioning jurors about the death penalty. (R. Memo 103). Respondents note that the trial court sustained an objection to defense counsel's questioning only after the question was asked three different ways. (R. Memo 103). Respondents maintain that defense counsel had no duty to continuing to question in light of the trial court's ruling, as further questions would have led to further sustained objections. (R. Memo 103).

On post-conviction review, the Mississippi Supreme Court addressed defense counsel's

---

[9] Petitioner specifically notes that potential jurors (1) Craigen; (2) Dickerson; (3) Tinnel; and (4) Williams were eliminated through the prosecution's challenges for cause despite their statements that they could follow the court's instructions.

cessation of questioning jurors about their views of the death penalty, and the related issue of counsel's failure to object to the State's rehabilitation of venire members. *Simon III*, 857 So.2d at 692. The court noted that the cessation of individual questioning occurred while Ms. Etheridge was being asked "whether she could 'follow the law and consider whether or not it's appropriate or not, even though you don't believe in it' [the death penalty]." *Id.* The trial court sustained an objection to the question and counsel's attempted rephrasing of the question, finding counsel had asked the substance of the same question three times. *Id.* at 692-93. The court found counsel did not render deficient assistance by failing to object to the trial court's admonition to cease asking the question to the remaining venire members, as the issue had been covered in depth by the trial court, the State, and defense counsel. *Id.* at 693. The court determined that potential jurors Etheridge, Craigen, Dickerson, Tinnel, and Williams had been "straightforward and unwavering" in their belief that they could not impose the death penalty, and that counsel did not render deficient performance by failing to object to the trial court's preemption of his questioning. *Id.*

The court also determined defense counsel did not render deficient performance by failing to object to the State's rehabilitation of jurors, finding that the record demonstrated individual voir dire was permitted where there was a question as to the juror's response. *Id.* at 693. The court found that even if deficient performance were presumed, prejudice could not be demonstrated. *Id.* at 693-94. The court determined that the trial record was clear that each of the jurors Petitioner claims should have been rehabilitated unequivocally indicated they could not impose the death penalty, and that sufficient grounds existed to strike each of those jurors. *Id.* at 694.

The record in this case does not support Petitioner's argument. Petitioner argues that

counsel failed to rehabilitate juror Diane Etheridge, who was challenged for cause. (*See* Trial Tr. Vol.11, 980-81). She would not impose a sentence of death. (*See* Trial Tr. Vol.10, 881-82). Potential jurors Craigen, Dickerson, Tinnel, and Williams all indicated that they would automatically vote against the death penalty. (*See* Trial Tr. Vol. 10, 883, 884, 885). As Respondents note, the jury was chosen out of the first forty-four venire members; therefore, prospective jurors Craigen, Dickerson, Tinnel, and Williams would not have been reached even if they had remained on the panel. (R. Memo 106-07).

Petitioner's argument that defense counsel should have "pointed out" to the trial judge that his opportunity for rehabilitation was cut-off when the State was allowed to attempt to rehabilitate prospective jurors who felt they could not impose the death penalty is without merit. The record is clear that during challenges for cause, both the State and defense counsel were able to bring jurors in for individual voir dire when a question arose as to the nature of their responses. (*See* Trial Tr. Vol. 11, 976-79; 985-86; 988-89; 991-95; 999-1002; 1005-107; 1008-09; 1010-12; 1014-17; 1017-18).

This Court determines that counsel did not render a deficient performance with regard to the rehabilitation of jurors. Petitioner takes liberties with the facts of the case by characterizing the trial court's statements as impeding his opportunity to rehabilitate potential jurors. Defense counsel asked potential jurors who stated that they did not believe in the death penalty whether they could "follow the Judge's instructions . . . and decide the guilt or innocence of this Defendant or any other Defendant in a capital case, can you do that, regardless of your feelings about the death penalty, can you listen at the evidence and follow the Judge's instructions and vote whether you believe the person is guilty or not guilty without thinking about any penalty, can you do that?" (Trial Tr. Vol. 11, 960-61). Defense counsel then asked whether those

individuals could "decide the guilt or innocence of the person without considering the penalty, not to say you wouldn't think about it, without considering the penalty as part of your decision making process on whether a person is guilty or not?" (Trial Tr. Vol. 11, 964).  Later, defense counsel stated, "[y]ou all understand that a cross section of the community includes people who believe in the death penalty and people who do not believe in the death penalty.  Do you understand that?" (Trial Tr. Vol. 11, 965).  When the trial judge sustained an objection to that question, defense counsel followed-up by asking whether the persons who indicated that they did not believe in the death penalty could still "follow the law and consider whether or not [the death penalty] is appropriate or not, even though you don't believe in it."  (Trial Tr. Vol. 11, 966).  An objection was made to the word "consider," and the trial court stated "[t]he Court has asked this question, Mr. Walls, and this is the third different way that you've asked the same question.  I'm sustaining the objection."  (Trial Tr. Vol. 11, 966).

Petitioner has failed to demonstrate the court reached a decision contrary to or involving an unreasonable application of *Strickland*, and he has failed to demonstrate the decision reached by the court was unreasonable in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

B.     *Deficient Efforts to Challenge Statements to Law Enforcement*

A hearing was held to determine whether Simon's statement to police officers should be suppressed, and Petitioner offered uncorroborated testimony that he had been beaten.  Police officers testified that he had not.  Petitioner asserts that there were at least three other witnesses who could have corroborated Petitioner's testimony, but that these witnesses were not called. Petitioner asserts that this resulted in the issue of psychological coercion being raised at trial, while the issue of physical coercion was without proof.  (Pet. 29-30).  Petitioner asserts that his

wife could have testified at the suppression hearing as to his wounds.  (Pet. 30) (Aff. of Martha Simon, Am. Pet. PCR, Ex. F).  Petitioner's brother, Aaron Simon, saw him within hours of his arrest and could have testified he was not bruised or beaten, though he was later when he and Martha went to visit Petitioner.  (Pet. 31) (Aff. of Aaron Simon, Am. Pet. PCR, Ex. B).  Also visiting that day was Rosie Simon, who could have described his injuries.  (Pet. 31) (Aff. of Rosie Lee Simon, Am. Pet. PCR, Ex. C).  Petitioner asserts that there was no strategic justification for failing to corroborate Simon's testimony, particularly in light of the fact that defense counsel made efforts to demonstrate psychological coercion through the testimony of Dr. Kallman, who testified both at the suppression hearing and at trial.  (Pet. 31).

Respondents assert Petitioner was arrested on February 3, 1990, and his confession took place on February 5, 1990, while Petitioner's family members stated that their visits did not take place until a couple of weeks following Petitioner's arrest.  (R. Memo 67) (*See* Am. Pet. PCR, Ex. C, Ex. E).  Respondents assert that the manner in which they describe the appearance of wounds would indicate fresh injuries.  (R. Memo 67).  Respondents note that any testimony regarding any alleged beating would have been hearsay and would have drawn an objection.  (R. Memo 68).  Respondents argue that these affidavits were produced fourteen years after the events in this case took place, and that family members did not see Petitioner until two weeks after he had given his statement to police.  (R. Memo 68).  Respondents assert defense counsel strategically decided not to call these witnesses as their  testimony could easily be impeached.  (R. Memo 68).

The Mississippi Supreme Court considered Petitioner's claim on post-conviction review and found the issue procedurally barred by the doctrine of res judicata.  *See Simon III*, 857 So.2d at 680.  The court stated that it had previously ruled Petitioner's confession was voluntarily

made. *Id.* In the alternative, the court determined Petitioner had not demonstrated either deficient performance or prejudice to his case as a result of counsel's failure to call family members at the suppression hearing. *Id.* at 688. The court found that the statements of Petitioner's family members were "self-serving and hearsay," and that affidavits offered no new information beyond what Petitioner testified to at the suppression hearing. *Id.* at 687. The court noted that the alleged injuries could have occurred at the hands of someone other than the police, and that the trial court would have not likely given weight to testimony of family members as to the origin of the injuries. *Id.*

The court also noted that the testimony of Petitioner's family members at trial would not have survived an objection by the State, as Petitioner did not testify at trial. *Id.* The court noted Dr. Kallman's testimony would not provide the basis for testimony as to physical coercion, as he only testified as to the possibility Petitioner may have been psychologically coerced. *Id.* Moreover, Petitioner would have had to overcome an adverse ruling, as the trial court had already denied the motion to suppress Petitioner's statement. *Id.* The court determined trial counsel's decisions were a matter of trial strategy, and that Petitioner failed to show that counsel's performance was deficient. *Id.*

The court went on to determine that even if counsel's performance was deficient, there could be no prejudice, as the court had previously found the statement voluntarily made. *Id.* The court noted it had weighed Petitioner's testimony against that of the three officers present when the confession took place, and that Petitioner's family members were not present during that time. *Id.* The court noted Petitioner did not testify at trial, and that his testimony at the suppression hearing was contradicted. *Id.* The court found the exclusion of Petitioner's

statement to police would have been of no aid to Petitioner, as he had confessed his involvement to his cellmate, he was present at a robbery where the murder weapons were stolen, some of the Parker family's personal belongings were found in his apartment, he was observed fleeing from Carl Parker's pick-up the night of the murder, and he was wearing clothing stolen from the Parker family when he was arrested. *Id.* The court found Petitioner failed to demonstrate how the failure to call his family members to testify at trial prejudiced the ruling of the trial court, and the court held Petitioner's claim "wholly without merit." *Id.*

Petitioner testified at the suppression hearing as to the physical coercion he endured, and the trial court found the statement voluntarily given. (*See* Trial Supp. Vol. 2, 236-242). While the affidavits of Petitioner's family members reference Petitioner's bruised, swollen appearance, they did not visit him until approximately two weeks after his arrest. (*See* Aff. of Rosie Lee Simon, Am. Pet. PCR, Ex. C). Petitioner's own testimony was that he was choked, and that an officer put him on the floor and put his boot or knee in Petitioner's back. (*See* Trial Supp. Vol. 2, 237, 242). Petitioner did not testify as to being punched or slapped in the face, though the affidavits of Petitioner's family members reference swollen eyes and a swollen mouth. (*See* Am. Pet. PCR, Ex. C, E). The affidavit of Martha Simon, Petitioner's wife, states that Petitioner was limping badly, and that he was so swollen she did not recognize him at first. (*See* Aff. of Martha Simon, Am. Pet. PCR, Ex. E). Petitioner was taken for his initial appearance within an hour or so of giving his statement to police. There is nothing in the record to support a finding that he had been beaten prior to that appearance. In light of the fact that these statements are self-serving and of the otherwise sufficient testimony given as to the statement's voluntariness, the Court does not determine the Mississippi Supreme Court was unreasonable in its application of *Strickland* precedent. Petitioner has not demonstrated that he is entitled to relief on this claim.

C.      *Failure to Challenge Prosecution's Case*

Petitioner contends that trial counsel rendered ineffective assistance during the guilt phase of his trial by failing to challenge certain evidence that connected him with the Parker family.  (Pet. Memo 37).  Petitioner asserts that the prosecution's evidence of guilt consisted of: (1) Simon's statement to police officers before the preliminary hearing; (2) two statements made to fellow inmates at Quitman County Jail; (3) the testimony of a woman who stated Simon and another had stolen two pistols from her on the Sunday prior to the murders; (4) the identification of Simon by police officer at the scene where Carl Parker's truck was found soon after the murders; (5) the prosecution's assertion that property connected with Parkers was found in apartment assumed to be Simon's; and (6) that Simon was wearing boots "equivocally" connected to Mr. Parker when he was arrested. (Pet. 32).

Petitioner asserts that if defense counsel had fully challenged the admissibility of Petitioner's statement, the identification of Petitioner at the scene, and the lack of proof of a connection to the apartment in Memphis, there would have been no credible proof of Petitioner's connection to the crime.  (Pet. 32).  First, Petitioner asserts that Walter Thomas, an officer with the Clarksdale Police Department, critically changed his testimony regarding his identification of Petitioner between the *Carr* trial and Petitioner's second trial, and that defense counsel failed to challenge this change in testimony.  (Pet. 33).  Second, Petitioner contends that there was no proof of his connection to the Memphis apartment where the property belonging to the Parkers was found.  (Pet. 33).  Third, Petitioner also asserts that defense counsel failed to challenge testimony linking Petitioner to the Memphis apartment, and without such a connection, the prosecution did not have independent proof of pecuniary gain to provide the proof of robbery. (Pet. 34-35).  Fourth, Petitioner contends that there was insufficient proof of burglary, the

underlying felony conviction for the murder of Bobbie Jo Parker, as the "usual practice of closing a house at night" is insufficient as a matter of law to support an inference of breaking. (Pet. 35).

Finally, Petitioner asserts that defense counsel made a perfunctory directed verdict motion at the close of the prosecution's case and failed to discuss the required elements of proof for the charges, and he maintains counsel performed deficiently by failing to renew the motion at the close of the prosecution's case. (Pet. 35).

The Mississippi Supreme Court considered Petitioner's claim on post-conviction review. *See Simon III*, 857 So.2d 668, 689-90. With regard to Officer Thomas' testimony, the court found that defense counsel "confronted Thomas with the inconsistencies and vigorously cross-examined him about them, apparently with a copy of a transcript from a previous hearing or trial in his hands." *Id.* at 689. The court also found that "[t]he record does not support the allegation that the connection between Simon and the Memphis apartment was not adequately contested by Simon's trial counsel." *Id.* The court noted a factual basis existed for testimony that the apartment did belong to Petitioner, and it also determined defense counsel objected to the State's attempt to connect Petitioner to the Memphis apartment on three separate occasions. *Id.* The court also addressed Petitioner's claim that defense counsel's failure to adequately contest ownership of the Memphis apartment led to the goods found there being admitted to prove the underlying felony of robbery. *Id.* The items found in the Memphis apartment were used to establish the underlying felony of robbery as to Carl Parker, and the underlying felony of burglary in the murder of Bobbie Jo Parker. *Id.* The court found that "[s]ince the evidence in the Memphis apartment was properly admitted at trial and since counsel contested the admission vigorously, it cannot be ineffective assistance for trial counsel to have failed to challenge the

State's proof of robbery." *Id.*

Petitioner's claim that trial counsel failed to contest the State's proof that Petitioner broke into the Parker home, which was a necessary element to prove burglary, was found to be without merit. *Id*. at 690. With regard to Petitioner's argument was that trial counsel failed to move for a directed verdict after all of the evidence had been presented, the court noted that Petitioner's counsel filed post-trial motions challenging the legal sufficiency of the presented evidence. *Id.* When trial counsel moved for a directed verdict at the close of the State's proof, the trial court found there to be "ample evidence in this case of the crime of burglary" and denied the motion. *Id.* As the post-trial motions were denied, the court determined the trial judge found the proof sufficient to support the verdict. *Id.* The court determined it was not ineffective assistance of counsel for defense counsel's failure to make a motion for directed verdict at the close of all of the evidence. *Id.*

A review of the record reveals that the cross-examination of Officer Thomas centered almost completely on Thomas's failure to identify Petitioner in previous testimony. (Trial Tr. Vol. 12, 1167-78). It is also clear that counsel had some prior transcript with which to impeach Thomas's testimony. (*See* Trial Tr. Vol. 12, 1172). Defense counsel also called Ruth Graves, a personnel officer with the Mississippi Department of Corrections, to testify to the fact that the Department's personnel records did not reflect that Thomas and Petitioner had ever worked together. (Trial Tr. Vol. 14, 1619). Petitioner has failed to demonstrate defense counsel was deficient in challenging Officer Thomas's testimony.

The Court also determines counsel had no basis for challenging the lack of proof connecting Petitioner to the Memphis apartment. The apartment was leased in Petitioner's name. (*See* R. Memo Supp. Ex. 1). Defense counsel's strategy at the suppression hearing was to

argue that Petitioner did not give his permission for his wife to consent to the search of the apartment. (Trial Supp. Vol. 1, 59-60). Moreover, defense counsel did object at trial to the prosecution's attempts to link Petitioner to the Memphis apartment. (*See*, *e.g.*, Trial Tr. Vol. 12, 1224; 1252-53). Counsel did not perform deficiently with regard to this issue.

Petitioner's attempt to argue counsel's deficiency in challenging the underlying felony of robbery is likewise without merit. Petitioner does not assert that the jury improperly gave double weight to any pecuniary motive. He concedes that the court found a distinct and separate act of robbery in the taking of Carl Parker's wedding ring. (*See* Pet. Memo 41). Rather, his argument is that without proof of connection to the Memphis apartment, there would have been no independent proof of pecuniary gain. As the Court has determined there was no basis for defense counsel to contest Petitioner's ownership of the Memphis apartment, Petitioner cannot demonstrate counsel performed deficiently on this issue.

Petitioner also contends that counsel performed deficiently in failing to bring it to the attention of the trial court that the usual practice of closing a house at night is insufficient to prove the "breaking" element of burglary.[10] (Pet. Memo 42). He argues defense counsel rendered ineffective assistance by making a perfunctory directed verdict motion that did not include the State's burden with regard to the elements of the charges and failing to renew his motion for a direct verdict at the close of all of the evidence. (Pet. Memo 42-43).

Respondents assert that the basis for Petitioner's claim that defense counsel was ineffective for failing to challenge the prosecution's failure to prove burglary essentially rests upon the argument that counsel was ineffective for failing to renew his motion for a directed

---

[10] The elements of the crime of burglary are (1) an unlawful breaking and entering of a dwelling with (2) the intent to commit a crime once entry has been gained. *See* Miss. Code Ann. § 97-17-23 (formerly § 19-17-19).

verdict after the State rested. (R. Memo 90). Respondents note that the only witnesses to testify between the motion for directed verdict and the close of the State's case were Ms. Ruth Graves and Dr. William Kallman, neither of whom gave any testimony relevant to the burglary charge. (R. Memo 92-93) (*See* Trial Tr. Vol. 14, 1616-1643). Respondents maintain that a renewed motion for directed verdict after these two witnesses would have been futile. (R. Memo 93) Respondents contend that even if counsel's performance could be considered deficient, his failure was not prejudicial, as the directed verdict could have only been granted with regard to the murder of Bobbie Jo Parker. (R. Memo 93).

The trial court found "ample evidence in this case of the crime of burglary of a dwelling house and the residence of the Carl Parker family." (Trial Tr. Vol. 14, 1590-91). Pursuant to Mississippi law, "breaking" may be demonstrated by a "preponderance of the circumstantial evidence." *See Rankin v. State*, 214 So.2d 811, 813 (Miss. 1968). Noting without reciting the facts already addressed that would put Petitioner at the scene of the crime the night of the murders, there was trial testimony that would support a conclusion that the doors to the Parker home were at least closed, if not locked, the night of the murders. Mike Parker, Carl Parker's brother, testified that Bobbie Jo Parker usually kept all of the doors to the house locked when she was there, but that the house was always locked when no one was home. (Trial Tr. Vol. 13, 1376). Scott Parker, Carl Parker's son, testified his father and stepmother always locked the doors to their home when they left. (Trial Tr. Vol. 13, 1395). Dean Parker, Carl Parker's son who visited the Parker home "at least every two days," testified that doors and windows were always locked when the family was away from home, and that even when they were home, the storm doors were kept closed. (Trial Tr. Vol. 13, 1415). Billy King, who saw the Parker home on fire as he was driving by on Friday night, attempted to enter the home through the front door,

which he found locked. (Trial Tr. Vol. 13, 1456). He also testified that the carport screen door was latched shut. (Trial Tr. Vol. 13, 1456). Moreover, it was cold and raining on Friday, February 2, 1990, making it unlikely that doors or windows to the Parker home would be open. (*See* Trial Tr. Vol. 13, 1377-78). Despite all of the testimony that would indicate the doors and windows to the Parker home were closed, defense counsel attempted to attack the lack of proof that the home was closed on the evening of February 2, 1990. (*See* Trial Tr. Vol. 13, 1421-23). Defense counsel also attempted to negate the State's proof and did not render deficient performance in challenging the State's proof of burglary. Moreover, absolutely no evidence of burglary was presented to the trial court between counsel's motion for a directed verdict and the close of evidence. Therefore, even if counsel was deficient in failing to renew his motion, Petitioner has not demonstrated he was prejudiced as a result. Petitioner is not entitled to relief on this claim.

D.      *Failure to Investigate Family Background*

Petitioner asserts defense counsel rendered deficient performance in investigating his family background, which included severe abuse at the hands of his father, Robert Simon, Sr. (Pet. 37). Petitioner maintains that he had family members available who could have testified to his abusive family background, but that they were not called by defense counsel. (Pet. 38-39).[11] Petitioner contends that the affidavits offered by family members demonstrate Petitioner's father was a large, intimidating man who isolated himself from his family and who regularly beat his

---

[11] Petitioner attached the affidavits of his family members to his Amended Petition for Post-Conviction Relief. These affidavits alleged a family history of physical abuse at the hands of Robert Simon, Sr., Petitioner's father. (*See* Aff. of Jerry Games, Ex. A; Aff. of Aaron Simon, Ex. B). An unsigned affidavit from Rosie Lee Simon, Petitioner's mother, was also attached to the Amended Petition for Post-Conviction Relief.

children for infractions such as reading aloud or coming home late from school. (Pet. Memo 17-18). Petitioner also incorporates into his petition by reference the affidavit of Joe Alford, a psychologist who reviewed the trial testimony of Dr. Kallman, who concludes Dr. Kallman's efforts were deficient. (Aff. of Joe Alford, Amend. Pet. PCR, Ex. D). Petitioner argues that the decision of the Mississippi Supreme Court warrants relief, as the court essentially found the facts of this case so horrendous that no amount of mitigating proof would have brought about a different result. (Pet. Memo 24). Petitioner contends that this is clearly not true, as the trial in *Simon I* resulted in a life sentence. (Pet. Memo 24).

Respondents maintain that the fact that no information was presented regarding familial abuse does not render counsel's performance deficient, as counsel had no reason to inquire further about Petitioner's childhood. (R. Memo 40). Respondents assert that the failure to investigate into an area of mitigation for which there is no evidence is not ineffective assistance of counsel. (R. Memo 40-43). Respondents maintain that Petitioner's failure to bring his familial history to the attention of counsel prohibits a finding that counsel was ineffective for failing to discover it. (R. Memo 43). Respondents note that while there are affidavits from three family members that Petitioner was beaten as a child, there are no hospital records, child welfare records, or police reports to corroborate the claims. (R. Memo 48). Petitioner did not file affidavits from neighbors or friends who could corroborate his claims. (R. Memo 48). Petitioner's mother testified at trial and abuse was not mentioned. Dr. Kallman interviewed Petitioner and abuse was not mentioned. Therefore, Respondents maintain, counsel had no basis to support an investigation into allegations of abuse. (R. Memo 49).

On post-conviction review, the Mississippi Supreme Court considered whether trial counsel was ineffective in failing to discover the allegations of abuse that would have

strengthened defense counsel's case in mitigation. *Simon III*, 857 So.2d at 683. The court noted that Petitioner was examined twice by Dr. Kallman for a total interview time of approximately ten hours. *Id.* at 684. At sentencing, Dr. Kallman testified as to Petitioner's employment history, family background, and personality characteristics. *Id.* He stated Petitioner was not a high school graduate, but that he had obtained his General Equivalency Diploma. *Id.* Dr. Kallman testified that Petitioner had been employed at Parchman and had been in the Army, and that he had difficulty finding suitable employment. *Id.* Dr. Kallman opined that Petitioner was a "loner," supportive of his family, and that nothing in his personality characteristics would indicate a pattern of violent tendencies. *Id.*

The court noted that neither Dr. Kallman nor Petitioner's mother, Rosie Simon, testified as to Petitioner's abusive home life. *Id.* After noting the substance of the affidavits filed in connection with this claim, the court stated:

> [W]e do not find that trial counsel's conduct fell below the ordinary standard of assistance of counsel because he did not inquire - without prompting - into the possibility of abuse of his client as a child. The affidavits attached to the petition, if taken as true, prove that there were witnesses capable of testifying in mitigation to this effect on Simon's behalf. However, none of the affidavits state that Simon's trial counsel was ever told before or during the sentencing phase of trial that Simon was abused as a child. *Id.* at 685.

The court found that Petitioner had failed to show a deficient performance by counsel and could not demonstrate an entitlement to relief. *Id.* However, the court went on to note that the aggravating facts of these three brutal murders were sufficient to remove a reasonable probability that the sentence might have been life imprisonment had the evidence of abuse been presented. *Id.* Therefore, the claim also failed the prejudice prong of *Strickland*. The court noted that trial counsel presented a coherent theory of mitigation at trial, and "[t]hat Simon can now concoct a 'better' case for mitigation provides no weight to the analysis of whether his trial

counsel provided effective assistance when it was rendered in 1990." *Id.* at 686.

Petitioner has not even asserted that he informed counsel of the early childhood abuse he endured, and neither Petitioner's mother nor Dr. Kallman testified as to any abuse in the family. The fact that counsel did not uncover or present evidence of an abusive family history is not indicative of a lack of trial preparation where counsel was given no information that would suggest such abuse had been present. *See, e.g., Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987) (interview of only those witnesses brought to counsel's attention reasonable); *Carter v. Johnson*, 131 F.3d 452, 465 (5th Cir. 1997) ("The duty of trial counsel to investigate is tempered by the information provided to counsel by the defendant."). Even if the Court were to assume counsel's deficient performance, Petitioner has not demonstrated the court was unreasonable in determining he had not been prejudiced. The fact that Petitioner received a life sentence in *Simon I* is not proof of prejudice. A *default* life sentence was imposed in *Simon I*, and that case involved only one victim. Petitioner has not demonstrated that the State court's denial of relief involved a contrary or unreasonable application of clearly established Supreme Court precedent on this issue.

E.      *Retention of Conflicted Expert & Failure to Develop Mitigating Evidence*

Psychologist Dr. William Kallman was appointed by the trial court to evaluate Petitioner approximately one week prior to the start of Petitioner's first trial. (Pet. 40). At both trials, Dr. Kallman testified Petitioner was a loner with slightly below average intelligence who tested average on psychological tests. (Pet. 41). Prior to the first trial, defense counsel moved for a continuance on the basis that he had an inadequate time to prepare and was denied. (Pet. 41). Petitioner asserts that because Dr. Kallman was also retained to evaluate Anothony Carr, Petitioner's co-felon, Petitioner had to use a conflicted expert who was hampered in his ability to

present favorable testimony at Petitioner's trial. (Pet. 41). Specifically, Petitioner contends that Dr. Kallman did not testify at Petitioner's trial as to Carr's inability to tolerate stress or conflict, his apparent participation in the instant crimes during a psychotic state, or his "troubled history." (Pet. 42). Petitioner maintains that Dr. Kallman testified about Petitioner during Carr's trial, thus giving the State a basis for damaging cross-examination during Petitioner's trial. (Pet. 43). Petitioner asserts counsel was ineffective for retaining an expert with a conflict of interest, and that he was denied an independent defense expert. (Pet. 43).

Petitioner asserts that Dr. Kallman's testimony at the *Carr* trial was that Carr's psychosis would tend to cause outbursts where he would often "snap" in a violent manner under stress. (Pet. 43-44). Petitioner maintains that there was evidence at trial to support that Carr was responsible for the deaths of the Parkers, and that counsel's retention of a conflicted expert diminished the possibility to make the most of this mitigating evidence.[12] (Pet. 44).

Petitioner points to other evidence that counsel failed to present as a result of counsel's retention of a conflicted expert. Mammie Elmore, from whom two pistols were stolen that were later connected to the murders at issue here, stated Petitioner was the "kinder" burglar who prevented Carr from hurting her. (Pet. 45). Petitioner asserts that an expert without a conflict of interest could have used this information as part of the case in mitigation. (Pet. 45). Attached to Petitioner's Amended Petition for Post-Conviction Relief was the affidavit of psychologist Dr. Joe Alford, who opined that Dr. Kallman's divided loyalties prevented a meaningful case in mitigation. (Pet. 36). Petitioner maintains that counsel's retention of this conflicted expert and his acquiescence in the arrangement was ineffective assistance of counsel.

---

[12] There was testimony at trial from a jail-house informant that Petitioner stated there was no intention of killing the Parkers, but that his "partner messed up." (Pet. 44).

Considering this issue during its review of Petitioner's application for post-conviction relief, the Mississippi Supreme Court determined Petitioner was not entitled to the effective assistance of an expert and considered the claim for the purpose of determining whether trial counsel was deficient. *See Simon III*, 857 So.2d at 685. The court determined that the record revealed trial counsel's strategy was to keep information regarding Carr's background from the jury, as it was based upon Dr. Kallman's opinion that Petitioner was the dominant figure in the relationship with Carr. *Id.* The court concluded questioning Dr. Kallman on the stand would have opened the door for the State to question Petitioner's leadership role in the relationship. *Id.*

The court noted it was clearly trial counsel's strategy to keep information about Carr from being presented to the jury, as defense counsel objected to the State's cross-examination of Dr. Kallman regarding Petitioner's leadership role in his relationship with Carr. *Id.* at 685-86.

Respondents argue, and the Court agrees, that there is no clearly established federal right to the effective assistance of an expert witness. *See*, *e.g.*, *Wilson v. Green*, 155 F.3d 396, 401 (4th Cir. 1998) ("The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness."). Furthermore, it is not clear to the Court how the appointment of Dr. Kallman to evaluate both Carr and Petitioner prejudiced Petitioner's case. Ms. Elmore was a witness the defense attempted to discredit. She may have believed Petitioner "kinder" than Carr, but her testimony was also that Petitioner robbed her of guns later connected to these murders. (*See* Trial Tr. Vol. 14, 1526-29). Defense counsel was seeking to discount her identification, not to validate it. Similarly, Petitioner has not shown that defense counsel performed deficiently in failing to question Dr. Kallman about Carr's characteristics, as it would have allowed the State to question Dr. Kallman about Petitioner's dominant role in his relationship with Carr. In sum,

Petitioner has failed to demonstrate that the decision reached by the Mississippi Supreme Court on this issue is contrary to, or involves an unreasonable application of, clearly established Supreme Court precedent.

F.      *Failure to Object to Delays*

Petitioner asserts that counsel rendered ineffective assistance by not objecting to fact that counsel was not brought before a judge and appointed counsel within a reasonable time.  (Pet. Memo 34).   Petitioner was arrested at around 3:30 p.m. on Saturday in Clarksdale, Mississippi.  (Pet. Memo 34).  Petitioner was held at the Clarskdale Police Department until Sunday, when he was then transported to the Coahoma County Jail. (Pet. Memo 35).  On Sunday afternoon, he was taken to Quitman County.  (Pet. Memo 35).  Petitioner maintains that he was not allowed to see his family or an attorney until Monday.  (Pet. Memo 35).  He also alleges that Anthony Carr and Willie Lee Henderson[13] were brought in for their initial appearances at around 10:00 a.m. Monday morning, and that the only reason he was not brought before a judge at that time was to give law enforcement officers an opportunity to interrogate him.  (Pet. Memo 35).  Petitioner maintains that he was finally arraigned at 1:15 p.m. on Monday, just under forty-six hours after his arrest.  (Pet. Memo 35).  Petitioner contends that he was interrogated at the Quitman County Sheriff's Office on Monday between 10:30 a.m. and 11:00 a.m. by Sheriff Harrison and two investigators with the Mississippi Highway Patrol.  (Pet. Memo 35).  Petitioner maintains that testimony from these law enforcement officials clarifies that the sole purpose in delaying his initial appearance and appointment of counsel was to get a statement from him.  (Pet. Memo 35-36).  Petitioner asserts that a judge came to the Clarksdale Police Department on Saturday to

_____

[13] Henderson was charged but later released.

sign a warrant to seize physical evidence from Petitioner, proving that judges were available on Saturday to advise him. (Pet. Memo 36). Petitioner maintains that there was no justification for counsel's failure to raise these issues. (Pet. Memo 36).

On post-conviction review, the Mississippi Supreme Court considered this issue. *See Simon III*, 857 So.2d at 688. The court noted that the voluntariness of Petitioner's confession had been previously affirmed by the court. *Id.* The court also noted that Petitioner's detention did not exceed forty-eight hours, such that the burden of proving any violation of the right to counsel rested with Petitioner. *Id.* The court noted that between his arrest and initial appearance Petitioner had to be moved to the county where the crime took place, and his initial appearance had to be coordinated with those of Carr and Henderson. *Id.* Also during that time, Petitioner had to be taken to the hospital to have a rape-kit performed. *Id.* The court found that counsel "put forth the best reasons for suppressing the confession to police - the alleged beatings by police, the lack of knowing waiver of rights, and the psychological pressures of the interrogation - in an effort to have the confession ruled inadmissible." *Id.* Therefore, the court found counsel did not render deficient performance. *Id.* The court also determined that Petitioner could not satisfy the prejudice component of the *Strickland* analysis, as the trial court had ruled the statement admissible and the Mississippi Supreme Court had affirmed the judgment. *Id.*

The Court need not reiterate the facts found by the Mississippi Supreme Court to support its conclusion. Petitioner has not demonstrated that the decision of the court was unreasonable. In addition to the facts found by the Mississippi Supreme Court, the Court notes that Petitioner's argument is incorrect. During the suppression hearing, defense counsel extensively questioned witnesses about the delay in appointing Petitioner counsel and bringing him before a judge in an effort to demonstrate the statement was not voluntarily given. (*See* Trial Tr. Vol. 12, 1093-94,

1097-99, testimony of Sheriff Harrison; Trial Tr. Vol. 12, 1238-39, testimony of Kenneth

Dickerson; Trial Tr. Vol. 12, 1273-77, testimony of Sheriff Thompson; Trial Tr. Vol. 12, 1325-

27, testimony of Bill Ellis).   Even if counsel's performance could somehow be considered

deficient with regard to this issue, Petitioner has also failed to demonstrate his statement was not

voluntarily given.  Petitioner is not entitled to relief on this claim.

G.      *Cumulative Effect*

Petitioner asserts that trial counsel's aggregate failures deprived him of the effective

assistance of counsel.  (Pet. 58-59).  Petitioner again lists his grievances with trial counsel's

performance, namely his failure to raise objections to the evidence and his failure to establish

coherent theories of mitigation.  (Pet. 58-59).   The Mississippi Supreme Court determined that it

was not likely that Petitioner would prevail on any of his ineffective assistance of counsel claims

were the case remanded to the trial court and found his trial counsel did not commit error, thereby

making the issue of whether counsel's errors cumulated in ineffective assistance of counsel moot.

*Simon III*, 857 So.2d at 698.  Petitioner argues that this decision was unreasonable, as the

evidence is sufficient to demonstrate that the collective error of counsel sufficiently undermines

confidence in the fairness of the result of the trial.  (Pet. Memo 50).

Respondents argue that there is no clearly established precedent of the United States

Supreme Court which requires a cumulative error analysis.  (R. Memo 110-111).  Respondents

assert that federal precedent requires an independent finding as to each claimed error of counsel.

(R. Memo 112).  Respondents argue that the *Strickland* Court realized some errors would have

isolated effect while others had pervasive effects, but that the standard has not been changed by

subsequent decisions of the Court. (R. Memo 113-114).

Habeas relief rarely lies on the basis of the cumulative effect of errors.  *See United Sates*

*v. Villarreal*, 324 F.3d 319, 328 (5th Cir. 2000). The grant of relief requires that the complained of errors be of constitutional dimension. *See Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997). Unless the trial was fatally infected by the constitutional errors, the fundamental fairness of the trial was not violated and no relief lies. *See, e.g., United Sates v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004). As Petitioner has failed to demonstrate deficient performance or prejudice as to any claim presented herein, Petitioner has not demonstrated an entitlement to relief on this claim. *See United States v. Hall*, 455 F.3d 508, 520-21 (5th Cir. 2006) (finding ineffective assistance of counsel not created from accumulation of acceptable decisions and actions).

## II. Transfer to Quitman County

*A.       Vicinage*

Petitioner argues that the denial of his motion that the trial be moved back to Quitman County violated his Sixth and Fourteenth Amendment rights. Petitioner objected to the trial of this cause in DeSoto County and made a request that the case be tried in Quitman County, citing his Sixth and Fourteenth Amendment rights to be tried in the jurisdiction where the offenses occurred. (Pet. 17-18). Petitioner presented this argument to the Mississippi Supreme Court on direct appeal, where the issue was framed as "whether the trial court erred in granting the motion and moving the case to DeSoto County, a county where the racial composition was disproportionate to that of Quitman County." *Simon II*, 688 So.2d 791, 803 (Miss. 1997). The court determined that there was no abuse of discretion in the trial court's decision to move the action to DeSoto County. *Id.* at 804.

Petitioner's trial for the murder of Charlotte Parker took place in Jones County upon a motion for a change of venue from Quitman County. Prior to the start of the second trial, which is the trial at issue in this habeas petition, Petitioner requested a change of venue from Jones

County. Petitioner filed his "Motion for An Order Changing Venue" on July 13, 1990, which stated Petitioner could not receive a fair and impartial trial in Quitman County and requested that venue be selected in a county with the same "proportional racial composition as exists in Quitman County." (*See* Trial Supp. Vol. 1, 5-6). On September 11, 1990, the trial court granted the request for a change of venue, and the cause was moved to DeSoto County for trial. (*See* Trial Tr. Vol. 10, 815). One week prior to trial, Petitioner filed another motion for a change of venue. Petitioner objected to the selection of DeSoto County due to its marked difference from Quitman County in its racial composition. (*See* State Court Papers Vol. 4, 651-53). The requisite affidavit was not attached at the time the motion was filed, so the motion was not heard until following the noon recess on the first day of voir dire. (*See* Trial Tr. Vol. 10, 810-11). At that time, Petitioner moved to withdraw his motion for a change of venue and have the trial take place in Quitman County. (Trial Tr. Vol. 10, 779). After allowing defense counsel to present witnesses in support of the motion, the trial court stated as follows:

> Originally, there was a change of venue motion from Quitman County to some other county, and when that motion was filed, the Court did grant it based on the allegations that because of the widespread publicity in Quitman County and because of the close proximity of this to all citizens of Quitman County, there was a strong likelihood that the defendant could not receive a fair and impartial jury in that county. The Court concurred with that and granted the motion. The Court still concurs with that. I think it goes without saying if it was true then, it's true now, and nothing that has transpired in the meantime has changed it. Quitman County, in the opinion of this Court, is not the appropriate place to try this case. Based on that, the Court did grant the motion and changed venue to this County, DeSoto County, Mississippi. DeSoto County has the facilities for handling cases of this sort, that's something the Court has to look for.
>
> . . . The Jackson papers were - - certainly go throughout the state, the Commercial Appeal goes throughout at least a northern portion of the state and into certain parts of the southern portion, the coastal newspapers, another local newspaper such as the Laurel Leader Call, the Hattiesburg papers and the Meridian papers and we were trying this case in Jones County, which is about half way in between the-

well, Laurel is about half way in between Hattiesburg and Meridian, certainly they're close, their radio station services the same area.

Frankly, there's no area in the State of Mississippi that the Court feels would be totally without coverage by these various news media. I don't believe that, generally speaking, the people in DeSoto County have had any more coverage than the people say in Bolivar County or Hinds County or Jones County or Humphreys County or Jackson County. This has been a highly publicized case, it will continue to be.  The distance from Quitman County to DeSoto County is not of any great significance, but the difference in the proximity makes a tremendous amount of difference in this Court's opinion as to how the individuals would feel.  Somebody in Quitman County it would be personal to.  It conceivably might be personal to a few people in DeSoto County, but it's not personal like it is in your own county, your own neighbors, your own associates, those people who you grew up with and have known, associated with.  It makes a lot of difference.  Quitman County, as the Court has said, is not the place to take the case or take it back to.

The Court recognizes that it is a constitutional right to be tried in the County of your - - where the case is based and where the Defendant is a resident, but in this case, the Defendant waived that when he asked for a change of venue and the Court concurred and thought the reason was correct. . . .. In this case, it's been waived and not unwaived and there was a real basis for it, fact[ual] basis that this Court acted on. . . . I do not believe there's any guarantee under the Constitution or any other law of any sort that guarantees a particular racial composition to any jury. I believe that there is such - - I do not believe that there is such. When you ask for a change, you're asking for a change to persons who are not connected, who have no reason to be prejudiced or favor one side or the other, they're not close enough to it. We don't really know what the persons in the jury, potential jury here in DeSoto County will say. We do know that we couldn't tell until we question them about their feelings about this case one way or the other. . . . .

As far as information is concerned that's contained in the newspapers, particularly since the *Carr* trial, certainly the *Carr* trial received publicity. The first *Simon* trial received extensive publicity, conceivably not as much as the *Carr* trial, but certainly enough to be well known throughout this state, this area, any part of the state you go to. I think it will be covered just about as well as the other.

A lot of information that was released to the general public was released under the order of the Mississippi Supreme Court when they declared that all the information from the *Carr* trial would be released after his jury was seated, and the Court had full knowledge that these were co-defendants, that the same evidence, the same publicity, the same witness to a great extent, everything was the same in these two cases. I would assume the Mississippi Supreme Court knew what would happen when that information was released, I would hope so. This Court made every effort

to see that these files were closed and kept closed, and it was at the motion of the Defense, and the Court preferred to go with the newspapers. . . .

. . . At any rate the Court does not feel that changing venue back to Quitman County would be appropriate. The Court does feel until shown otherwise that DeSoto County will be as good a place to try this case as any other place, frankly better as far as the Court can see or it wouldn't have brought it here to begin with, certainly because of the availability of facilities, personnel, the willingness of them to try it, the availability of the courthouse and the convenience of all persons concerned.

As I stated, I do not feel that there's any reason to think that we have to guarantee any particular makeup of any particular jury. The same argument was made in Jones County. I think Jones County was approximately the same - - maybe the same makeup as DeSoto County. I believe the claim has been made that DeSoto was somewhere between 20 and 25 percent; Jones County was something about that. We did have two black jurors and the defendant did not received the death penalty as everyone knows.

I do not know what will happen in DeSoto County. It always depends on how the jury falls and who's drawn and that's by - - under the laws of the State of Mississippi and the United States government, they require that they be done at random. We have no control over that and don't want to have any control.

The Court's rule, as far as the change of venue is concerned, feels like it's been made, it's appropriate that it stay here, should not be moved back to Quitman County, and the Court's rule of that portion of the motion is denied.

And with regard to a continuance, the Court feels there has certainly been publicity about this case, there was publicity about this case when we transferred the first of the trials in this case for the four charges against Mr. Simon to Jones County, a claim was made that immediately that would bring on publicity in Jones County and it did, and the same thing has happened wherever it's been, and it's been the same rehash of what has taken place every time. The press has seen fit to quote everything about this case that they could remember from the beginning to the end. As stated, this Court has made every effort to have as little publicity about this case and as little prejudicial publicity about it as it possibly could, and it was not through the efforts of the Defense of the Court or the State that this was not always carried out. I don't think that anything would be availed by postponing the case. As soon as it was announced it was going to be tried next December or whenever we might set it, the same publicity would be extant again or continue to be extant. It's a prominent case, it has always been and will continue to be as long as it's around to be tried, and the only thing this Court knows is to go ahead with the case and complete it, . . . (Trial Tr. Vol. 10, 815-818).

On direct appeal, Petitioner argued that his second motion for a change of venue was conditional, inasmuch as he retained his right to be tried in the county where the offense occurred in the event the case was moved to a less favorable county. *See Simon II*, 688 So.2d at 803. Petitioner argued that DeSoto County was only forty miles from where the crime occurred, and the county was saturated with pretrial publicity. *Id.* Petitioner also argued that DeSoto County was 83.2 percent white, while Quitman County's racial composition was 53.6 percent black. *Id.* The Mississippi Supreme Court noted that Petitioner had raised a similar argument on direct appeal in *Simon I*, and the court there stated "that the Sixth Amendment to the Constitution of the United States has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the populations." *Simon II*, 688 So.2d at 803, citing *Simon I*, 633 So.2d at 412.

The court noted that an accused has the right to a change of venue when it appears as though an impartial jury can not be obtained, which is presumed when there is "strong public sentiment against the defendant." *Id.* at 803 (citation omitted). The court noted the "enormous amount of publicity" generated by the cases and determined it would be unlikely to seat a jury anywhere in the State which did not contain some members who had heard about the case. *Id.* at 804. The court noted that the DeSoto County venire was thoroughly examined, and each seated juror stated they could be fair and impartial jurors if chosen. *Id.* The court determined there was no abuse of discretion by the trial court in its decision, and it affirmed. *Id.*

The Sixth Amendment to the United States Constitution provides that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . .". U.S. Const. amend VI. The Fifth Circuit has held that

this right is not applicable to the states. *See Cook v. Morrill*, 783 F.2d 593, 595 (5th Cir. 1986); *Martin v. Beto*, 397 F.2d 741, 748 (5th Cir. 1968). Petitioner is entitled to relief only if he can show that the trial court's change of venue denied him due process. *See Cook*, 783 F.2d at 596. Petitioner asked for and received a change of venue after he alleged that he could not receive a fair trial in Quitman County. Petitioner has not demonstrated that the decision of the court was an unreasonable application of Supreme Court precedent, and he is not entitled to relief on the sub-issue of vicinage.

B.      *DeSoto County*

Petitioner maintains the court's change of venue to DeSoto County merely moved the case closer to Memphis, Tennessee, the primary media market. (Pet. 18). On direct appeal, Petitioner raised the claim that the change of venue resulted in (1) the denial of his right to be tried in the jurisdiction where the offense occurred; (2) the impaneling of jurors who were partial; and (3) his trial being held in an area with overwhelming prejudicial publicity. *See Simon II*, 688 So.2d at 801-04. He argues these same points in the instant petition, but this sub-issue is concerned with the issue of pretrial publicity in DeSoto County.

On direct appeal, the Mississippi Supreme Court noted that Petitioner moved for a change of venue from DeSoto County one week prior to the beginning of trial on the basis that (1) DeSoto County's racial makeup was not comparable to Quitman County, and (2) that there was a disproportionate amount of prejudicial pretrial publicity in the DeSoto County area. *Simon II*, 688 So.2d at 801. The trial court denied the motion. *Id.* at 801-802. The Mississippi Supreme Court determined that "each of the impaneled jury members affirmatively stated that they could serve as fair and impartial jurors," which the court determined was the "linchpin" of the

prejudicial publicity inquiry. *Id.* at 804. The court found no abuse of discretion by the trial judge and denied Petitioner relief. *Id.*

In his habeas petition, Petitioner asserts that potential "jurors who stated that they did not 'feel like [they] could be impartial juror[s]' were impaneled over defense objection. (Pet. 18-19). First, the Court notes Petitioner does not specify in his petition which jurors he is referencing. However, Petitioner made this argument in the context of ineffective assistance of counsel, which the Court previously addressed, and the Court will assume Petitioner intended to assert this claim as to the same jurors as were mentioned in the earlier claim. Petitioner asserts that jurors (1) Kilgore, (2) Elder, (3) Clutter, (4) Robinson, and (5) Moore had read articles and/or seen news accounts of the crime prior to trial. (*See* Part I.A. n.5, *supra*, at 14). Ms. Linda Kilgore informed the trial court that she could lay aside what she had read or heard about the case and render a fair and impartial verdict. (*See* Trial Tr. Vol. 10, 844). Ms. Barbara Elder also informed the trial court she could serve as an objective, impartial juror. (*See* Trial Tr. Vol. 10, 845). Ms. Margaret Clutter stated she could be an objective juror who rendered a decision without regard to any outside information. (*See* Trial Tr. Vol. 10, 846-47). Ms. Ann Robinson stated she would not be influenced by anything she had read or heard about the case. (*See* Trial Tr. Vol. 10, 847-48). Ms. Laura Moore, who sat as an alternate juror, stated she felt as though she could serve as a fair and impartial juror. (*See* Trial Tr. Vol. 10, 852-53).

The Constitution does not require jurors ignorant of the facts of a particular case, but rather, it entitles a defendant to a verdict rendered on the presented evidence. *See, e.g., Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961). A trial court's findings with regard to potential bias by a venire member is entitled to deference. *See, e.g.,*

*Patton v. Yount*, 467 U.S. 1025, 1036-37 n.12, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984)

("The constitutional standard that a juror is impartial only if he can lay aside his opinion and

render a verdict based on the evidence presented in court is a question of federal law; whether a

juror can in fact do that is a determination to which habeas courts owe special deference.").   In

this case, the trial court found each of the mentioned jurors capable of rendering a fair, unbiased

verdict, and the record does not support Petitioner's contention of bias.  Petitioner has failed to

demonstrate an entitlement to relief on this sub-issue.


C.      *Racial Demographics of DeSoto County*

       Petitioner asserts that the combination of the racial demographics of DeSoto County with

the prosecution's use of cause and peremptory challenges to strike black venire members violated

his rights to equal protection.  (Pet. 26).  Petitioner states that Quitman County is predominately

black, while DeSoto County is predominately white, and that more than sixty Mississippi counties

had a higher percentage of black residents than DeSoto County.  (Pet. 26).

       This issue was raised on direct appeal, where the Mississippi Supreme Court cited its prior

decision in *Simon I*, stating:

         Although the defendant does have a right to be tried by a jury whose members
         were selected pursuant to a nondiscriminatory criteria, the *Batson* court noted that
         the Sixth Amendment to the Constitution of the United States has never been held
         to require that petit juries actually chosen must mirror the community and reflect
         the various distinctive groups in the populations.

*Simon II*, 688 So.2d at 803 (citation omitted).

       Petitioner has not established that he had a right to a venire of any particular racial

composition.  *See Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690

(1975) (petit juries must be drawn from source representative of community but it is not required that the seated jury "mirror the community"). Petitioner has failed to demonstrate that the decision reached on this issue is contrary to, or involves an unreasonable application of, clearly established federal precedent. He is not entitled to relief on this sub-issue.

### III. Prosecutorial Misconduct

A.    *Batson* Violation

Petitioner asserts that four black jurors were struck for cause based upon their opposition to the death penalty, despite their statements that they could follow the court's instructions. (Pet. 25).[14] Following challenges for cause, only two black venire members remained. The prosecutor then exercised a peremptory challenge against Annie Jamison, one of the two remaining black jurors. Defense counsel objected on the basis of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and the trial court ordered the prosecutor to provide a nondiscriminatory reason for the strike. (Pet. 25). Petitioner asserts that the prosecutor used race to defend a race-based challenge when he stated that in response to questions about race and the crime, the juror "looked down" and "was intimidated." (Pet. 25). Petitioner asserts that the second reason offered by the prosecutor for the strike was that the juror was worried about being away from her family, but that this reason was given by many white members of the panel who were not struck by the prosecutor. (Pet. 25).

On direct appeal, the Mississippi Supreme Court noted that Petitioner, a black male, was

---

[14] The Court notes that black venire members struck for cause were (1) Gregory Craigen, (2) Marie Dickerson, (3) Jessie Tinnel, and (4) Arlettie Williams, each of whom stated they would not impose the death penalty. *See* Part I.A., *supra*, at 18-21.

convicted by an all-female jury with only one black juror. *Simon II*, 688 So.2d at 807. The court

noted that the State offered the following reasons for removing Ms. Jamison: (1) Ms. Woods, a

black female, was previously accepted; (2) Ms. Jamison looked intimidated when both the State

and defense counsel discussed the black-on-white aspects of the crime; and (3) Ms. Jamison had

two children and a blind grandmother in her care. *Id.* The trial court determined the reasons

offered by the State were racially neutral and overruled the objection, "stating systematic

exclusion had not been demonstrated by the exercise of a peremptory against Jamison." *Id.*

Petitioner argued that the reason offered by the prosecution was patently pretextual. *Id.* The

State argued to the Mississippi Supreme Court that: (1) Simon failed to make out a prima facie

case of purposeful discrimination; (2) the prosecutor was required to offer a race-neutral reason

nonetheless; and (3) the State's reasons for the strike were sufficiently race-neutral under the law.

*Id.*

The court recited *Batson*'s three-pronged test for establishing a prima facie case of

purposeful discrimination:

> To establish such a case, the defendant must first show that he is a member of a
> cognizable racial group, and that the prosecutor has exercised peremptory
> challenges to remove from the venire, members of the defendant's race. Second,
> the defendant is entitled to rely on the fact, as to which there can be no dispute,
> that peremptory challenges constitute a jury selection practice that permits 'those
> to discriminate who are of a mind to discriminate.' Finally, the defendant must
> show that these facts and any other relevant circumstances raise an inference that
> the prosecutor used that practice to exclude veniremen from the petit jury on
> account of their race. This combination of factors in the empaneling of the petit
> jury, as in the selection of the venire, raises the necessary inference of purposeful
> discrimination. *Id.* at 807-08 (citation omitted).

The court noted the importance of credibility issues raised by a *Batson* challenge, and it

stated that the trial judge's factual findings are "given great deference and will not be reversed

unless they appear clearly erroneous or against the overwhelming weight of the evidence." *Id*. at 808 (citation omitted). The court found Petitioner had satisfied the first two prongs of the test, as he was black and a prospective black juror had been challenged, but determined Petitioner must still show intent on the part of the State to use its peremptory challenges to exclude minorities. *Id.* The court determined the trial court was satisfied that the State offered a racially neutral reason, and that determination was not viewed as clearly erroneous or against the overwhelming weight of the evidence. *Id.*

The documents filed in this case reveal that there were ten black venire members at the beginning of jury selection. (*See* R. Memo, Ex. D).[15] The State had only exercised one peremptory challenge when a challenge was exercised as to Annie Jamison, a black female. During voir dire, Ms. Jamison had expressed hesitancy at her ability to serve on the jury, as she had two small children and a blind grandmother for whom she cared. (*See* Trial Tr. Vol. 10, 872-874). When questioned further, Ms. Jamison responded that she could probably serve on the jury as long as she could make arrangements for someone to care for her children and grandmother. (*See* Trial Tr. Vol. 11, 926). During challenges for cause, the prosecution challenged Ms. Jamison. (*See* Trial Tr. Vol. 11, 975-76). Defense counsel objected on the basis that Ms. Jamison was black, and while the objection was overruled, Ms. Jamison was questioned by the trial judge as to whether she could perform her duties if selected. (*See* Trial Tr. Vol. 11, 977-978). Ms. Jamison stated she could serve on the jury as long as she was given enough time to make

_____

[15] These potential jurors were: (1) Annie Jamison, juror no. 19; (2) Daisy Woods, juror no. 26, (3) Gregory Craigen, juror no. 49; (4) Marie Dickerson, juror no. 50; (5) Ninnie Nichols, juror no. 55; (6) Jearline Edwards, juror no. 65; (7) Jessie Tinnel, juror no. 71; (8) Arlettie Williams, juror no. 72; (9) Calvin Dennis, juror no. 73; (10) Pearlie Hardrick, juror no. 74.

arrangements to get someone to take care of her grandmother. (*See* Trial Tr. Vol. 11, 978-79). The trial court refused to excuse her for cause. (*See* Trial Tr. Vol. 11, 979).

After both sides completed challenges for cause, the prosecution presented a full panel to the defense, challenging only one juror out of the first thirteen jurors remaining after challenges for cause were completed. (*See* Trial Tr. Vol. 11, 1020). Defense counsel used peremptory challenges for eight of the twelve, with both parties agreeing upon four jurors. (*See* Trial Tr. Vol. 11, 1021). When the next eight jurors were called up, the prosecution challenged Ms. Jamison and accepted the others. (*See* Trial Tr. Vol. 11, 1021). At that point, defense counsel raised a *Batson* challenge, and the trial court stated that it did "not really know that there's been any proof or that there's any prima facie case of deliberate exclusion of jurors because of race or because Ms. Jamison is the only black at this point. The Court will ask the State to give a particular reason, a non-racial reason for challenge to Ms. Jamison." (Trial Tr. Vol. 11, 1022). The following transpired:

> [District Attorney Mellen]: Your Honor, I point out that juror number 26, we accepted, and that is a black female and we - - so out of the Jamison and Woods, we did - - we challenged Jamison. Your Honor, I notice that when I asked the question earlier about race, and race should have no significance in this case and did they believe this, did the jury, potential jury believe race even though the victims were white and the Defendant and his accomplice were black, that it should not have any significance. She looked down and would not look up during this. Mr. Walls asked pretty well the same question, except he asked the question, 'would this race situation affect any of you in any way.' She kept - - she dodged or ducked her head down, did not look up and then she looked to the side a few times, and I think that she is intimidated because of that and these were what I observed concerning her. This is in addition to what she's already said concerning the fact that she was concerned about her two children, she's got a blind grandmother she looks after, her husband works on a shift at night and midnight shift, and so we feel that certainly those reasons and the fact that Ms. Woods was kept without any question at all, is articulable, and it is peremptory, it's not cause.

[Defense Counsel Walls]: Your Honor, we could disagree that those are articulable reasons. The District Attorney did not question Ms. Jamison about either one of those things you raised other than what she was questioned about when she was brought back in chambers and that was about the sequestration, the children and the blind grandmother, but she was not questioned as to whether she was looking down because she just bowed her head or what. I mean a lot of people look down, a lot of the jurors look down when you ask a question. I don't think that indicates one way or the other that she was thinking one way or the other unless she was asked about it.

[District Attorney Mellen]: Your Honor, it happened twice and these were observed by me. I don't know whether it could be said that I didn't see those, I did, and so it became obvious that she dropped her head down.

[Judge Pearson]: Well, the challenges for - - peremptory challenges have to be exercised for a reaon, non-race related reason that's articulable, but does not have to rise to the level of cause. The Court feels that the requirements have been met with regard to Ms. Jamison. Also the Court has stated it does not feel that there's been any - - shown that there's been any real systematic exclusion of blacks on this jury, so the Court will overrule the objection. (Trial Tr. Vol. 11, 1022-24).

Once the trial court required the prosecutor to state his reasons for striking Ms. Jamison, the burden shifted to the State to assert a race-neutral explanation for the strike. *See Hernandez v. New York*, 500 U.S. 352, 358-59, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). At this step, the proponent of the strike need not give a "persuasive, or even plausible" explanation as long as it is free of inherent intent to discriminate on its face. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Here, the prosecutor explained that Ms. Jamison appeared intimidated and refused eye contact during questioning about the racial aspects of the crime. Petitioner's argument that the prosecutor used a race-based explanation to refute a race-based challenge is a specious one. While the question posed to prospective jurors was race-based, the challenge was made on the failure to make eye contact and appear comfortable considering the facts of the crime. Both the defense and the State questioned the panel about the racial aspects of the crime in an effort to pick a jury not influenced by passion or prejudice. Ms.

Jamison's reactions to these questions in conjunction with the familial concerns she expressed led the prosecutor to believe she would be a less than ideal juror. The United States Court of Appeals for the Fifth Circuit has explicitly accepted a failure to maintain eye contact "a legitimate rationale" for the exercise of a peremptory challenge. *See United States v. Bentley-Smith*, 2 F.3d 1368, 1374 (5th Cir. 1993), citing *Polk v. Dixie Ins. Co.*, 972 F.2d 83, 86 (5th Cir. 1992).

Only two black venire members were reached during the jury selection process. It is significant to the issue of discriminatory intent that Ms. Daisy Woods, the only black juror other than Ms. Jamison, was accepted by the prosecution. *See United States v. Lara*, 181 F.3d 183, 194 (1st Cir. 1999) (lack of pattern of discrimination in use of peremptories relevant to determining whether race-neutral explanation pretextual); *see also United States v. Sangineto-Miranda*, 859 F.2d 1501, 1521-22 (6th Cir. 1998) (noting composition of jury relevant to *Batson* prima facie inquiry). The Mississippi Supreme Court appropriately afforded the fact-finding of the trial court deference. *See Batson*, 476 U.S. at 98 n.21, 106 S.Ct. at 1724 (deference given to discriminatory intent inquiry as it turns largely on credibility evaluation). Petitioner has not demonstrated that the decision of the Mississippi Supreme Court involved an unreasonable application of clearly established federal law, and he is not entitled to relief on this issue.

B.     *Brady Violation*

In the trial of Petitioner's co-felon, Anthony Carr, Clarksdale police officer Walter Thomas testified that he responded to a call relating to the Parker truck, and that as he neared the area, he saw two men running away from the truck. He stated at the *Carr* trial that he could not identify either man. In *Simon II*, Thomas stated that one of the men "could have fitted Mr. Simon's description," and that he knew Petitioner from having worked with him at Parchman in

1985 or 1986. (Pet. 36). Petitioner maintains that while his counsel attempted to impeach Thomas's testimony, he was unable to effectively establish that Thomas had added to his testimony since the *Carr* trial, as the material was not disclosed to the defense. (Pet. 36).

Respondents assert that the testimony from the *Carr* trial is not exculpatory, but they concede the testimony could have been used for purposes of impeachment. (R. Memo 118). Citing the record of Thomas's testimony at trial, Respondents argue that Thomas did not "identify" Petitioner, but that he merely made a statement that he resembled one of the men running away from the vehicle. (R. Memo 120). Respondents argue that as the "hammering cross-examination" takes up several pages of trial transcript, it is apparent counsel knew of the prior testimony and was ready to use the transcript to impeach Thomas. (R. Memo 124). Respondents opine that though the source of the transcript was not identified by defense counsel, the prosecution implied on re-direct examination that it was from Petitioner's first trial. (R. Memo 124-25). Moreover, Respondents argue, a copy of the transcript from *Simon I* was furnished to the State and defense counsel on the hearing on the double jeopardy motion in *Simon II*. (R. Memo 125; *see also* R. Ex. A, testimony of Thomas from *Simon I*). Respondents assert that Petitioner had the same testimony from *Simon I* necessary to impeach Thomas's expanded testimony in *Simon II*, such that there was no *Brady* violation and no reasonable probability that the results of the proceeding would have been different had the State furnished Petitioner with a copy of Thomas's testimony from the *Carr* trial. (R. Memo 126-128).

In the context of an ineffective assistance of counsel claim for failure to contest Thomas's identification, the Mississippi Supreme Court found that "counsel confronted Thomas with the inconsistencies and vigorously cross-examined him about them, apparently with a copy of the

transcript from a previous hearing or trial in his hands. His cross-examination comprises eleven pages, nine of which are spent on this one issue." *Simon III*, 857 So.2d at 689. Later in the same opinion, the court specifically addressed the question of whether a *Brady* violation occurred, and the Mississippi Supreme Court determined the issue was procedurally barred. *Id*. at 698. However, the court went on to note that it doubted "whether this even qualifies as a *Brady* violation and, assuming it is, it had no effect on the outcome of his trial." *Id.* The court noted that Carr's trial was "hardly one month prior" to the trial at issue here, making it unlikely that the testimony had yet been transcribed. *Id.* The court also noted the testimony was not favorable, nor was it unknown to Petitioner. *Id.* The court also determined that Thomas's statement was "hardly exculpatory," as in both *Carr* and *Simon I*, Thomas described the fleeing men as black males. *Id.*

The court acknowledged that Thomas's testimony in *Simon II* was slightly more inculpatory than his statement in the two previous trials. *Id.* at 698-99. The court noted, however, that the change in testimony "was hardly a secret," given the "vigorous impeachment on cross-examination" by defense counsel. *Id.* at 699. The court found it clear that counsel had a transcript from the *Carr* trial, *Simon I*, or a hearing jointly held. *Id*. The court stated that "[h]ad [Petitioner's] counsel possessed the *Carr* transcript during cross-examination of Thomas in *Simon II*, he would have done exactly the same thing as he did." *Id.* The court found that Petitioner's trial would have not been altered had this information been available and found that if a *Brady* violation did occur, it was harmless. *Id.*

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

55

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). Evidence is deemed material and constitutional error results from its suppression if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Therefore, in order for conduct to constitute a "*Brady* violation," prejudice must result from its suppression. *See Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

In *Simon II*, Officer Thomas stated on direct examination that he was responding to a dispatch call in the area where the Parker truck was later found when saw two black males run by his patrol car at a distance of approximately five feet. (*See* Trial Tr. Vol. 12 1154, 1158-59). When asked whether he could give a physical description of the men he saw, Thomas stated:

> Well, maybe not of both subjects, I only - - I only got a glimpse, it was real noticeable like with them coming at me like that, I could maybe possibly just say whom or what one of them might have looked like, but that's about all.
> Q: Tell us then what one of them looked like.
> A. Well after I had seen the subjects and then after noting that - - noting about what had transpired, I thought that one of the subjects could have fitted Mr. Simon's description. (Trial Tr. Vol. 12, 1164).

Defense counsel elicited from Officer Thomas that his testimony was in conflict with that of Eddie Spralls, who testified he saw the men run in the opposite direction from what Thomas testified to. (Trial Tr. Vol. 12, 1168). Defense counsel asked whether Thomas identified the persons, and he stated he did not identify them, but he did know who one of them resembled. (Trial Tr. Vol. 12, 1170). Defense counsel questioned him about an "earlier hearing" where the only thing Thomas could state by way of identification was that they were two black males who

looked like adults. (Trial Tr. Vol. 12, 1170). Defense counsel asked whether Thomas recalled

"that testimony earlier where you were asked about the identity of these people you saw, and you

never once said they looked like anybody[.]" (Trial Tr. Vol. 12, 1171). Officer Thomas stated he

had never been directly asked that question before, but he conceded that he had never testified

that the persons he saw resembled anyone he knew. (Trial Tr. Vol. 12, 1171). Defense counsel

asked Thomas to "read these lines and just tell me if you remember this." (Trial Tr. Vol. 12,

1172). Thomas stated:

> A. "[t]he question was: 'Could you tell whether they were men?' 'They were male, they were men,' that was my response."
> Q. All right.
> A. And another question was: "Were they adults?" The answer was: "They were adults, yes, sir."
> Q. All right. What's the next question?
> A. Next question was: "What about them indicated to you that they were adults?" The answer was: "Well, they from their size, I glanced, I knew they wasn't kids." It says, "About what size were they?" Answer was: "I can't really say - - just give an exact description as to size." (Trial Tr. Vol. 12, 1172).

More of the same compromises an additional six pages of the trial transcript. Defense

counsel elicited from Thomas that Thomas did not know how the men were dressed, and that he

could not describe their size or features. (*See* Trial Tr. Vol. 12, 1178). In addition, defense

counsel pointed out that his testimony as to what direction the men were running was in conflict

with Mr. Spralls's testimony. (Trial Tr. Vol. 12, 1168). Defense counsel also asked Thomas

were he had worked with Petitioner, and Thomas stated he had been Petitioner's supervisor at the

Mississippi Department of Corrections. (Trial Tr. Vol. 12, 1174). On re-direct examination, the

prosecutor referenced the "last hearing" of which defense counsel had the transcript and from

which defense counsel was reading. (Trial Tr. Vol. 12, 1178).

The Court determines Petitioner has failed to demonstrate that his trial would have

resulted differently had the State produced the transcript from the *Carr* trial.  It is clear that

defense counsel had a transcript with which to impeach Officer Thomas's testimony, and counsel

cross-examined Thomas on the inconsistencies in his testimony.  Petitioner has failed to

demonstrate that he is entitled to relief on this claim.


C.        *"Surprise" Witness*

Petitioner maintains that his constitutional rights were violated when the prosecution was

allowed to put into evidence a last-minute witnesses, Mamie Elmore, who testified that two

pistols were taken from her during a burglary of her home in January of 1990.  (Pet. 48-49).  Ms.

Elmore testified that she came home from church on Sunday, January 28, 1990, at around 12:15

p.m. and discovered two men in her home.  (Trial Tr. Vol. 14, 1526).  Two guns were stolen from

her at that time.  (Trial Tr. Vol. 14, 1528).  A week after the burglary, she saw pictures of the men

on television and in the newspaper and recognized Petitioner as one of the men who was in her

home.  (Trial Tr. Vol. 14, 1529).  Petitioner argues that no prior notice of Ms. Elmore's

testimony was given, and that this "other crime" evidence lacked any connection to the crimes

charged.  (Pet. 49).  The Mississippi Supreme Court considered this claim on direct appeal as

Issue XII, but the court summarily denied relief on the claim.  *See Simon II*, 688 So.2d at 795,

798-801 ("The Court hereafter speaks only to those issues meriting full discussion; however, each

of the issues presented by Simon have been fully considered by this Court.").

The record reveals that prior to the afternoon session of trial on October 9, 1990, counsel

met with the trial judge in chambers to address "other crimes" evidence the prosecution intended

to offer.  (Trial Tr. Vol. 12, 1139).  One item of evidence concerned the burglary of Mamie

Elmore's home on January 28, 1990, five days prior to the murder of the Parker family. (*See* Trial Tr. Vol. 12, 1141). Two pistols that ballistics later linked to the weapons used to murder the Parker family were stolen from her during the burglary. (Trial Tr. Vol. 12, 1141). These pistols were found at the Parker truck along with items taken from the Parker home. (*See* Trial Tr. Vol. 12, 1141). The prosecutor informed the trial court and defense counsel that the State intended to introduce Ms. Elmore's testimony to state she could identify Petitioner and that the pistols were taken from her by Petitioner on January 28, 1990. (Trial Tr. Vol. 12, 1149). The trial court reserved ruling. On October 10, 1990, the court revisited the issue of Ms. Elmore's testimony and noted that the State was under no obligation to notify the defense of its intention to offer the testimony, as defense counsel declined to invoke discovery in this case. (Trial Tr. Vol. 13, 1333-34). Noting that the evidence was "prior bad act" testimony, the court nevertheless determined Ms. Elmore's testimony was admissible for purposes of her identification of Petitioner and probative as to his possession of the firearms.[16] (Trial Tr. Vol. 13, 1335-36).

Defense counsel asked that the prosecution produce copies of any statement Ms. Elmore may have given police officers, and the court reminded counsel he had not invoked discovery. (Trial Tr. Vol. 13, 1337). The prosecutor stated for the record that defense counsel made a strategic move not to invoke discovery, and that the State's willingness to be open about the witness should not work against its interests. (Trial Tr. Vol. 13, 1338-39). Defense counsel responded, "[w]e're not saying that he can't call the witness, we're just simply saying that now that we know that he's going to call the witness, if this witness has made inconsistent statements, I think that we would be entitled to it. . .". (Trial Tr. Vol. 13, 1339-40).

---

[16] Also at issue was defense counsel's objection that Ms. Elmore's identification may have been tainted, which is not an issue before this Court.

On October 11, 1990, again in chambers, the trial court stated that the State would turn over any statements that existed on the issue of Ms. Elmore's identification, and it determined that defense counsel would have an opportunity to interview the witness prior to her testimony. (Trial Tr. Vol. 14, 1505). A copy of her statement was given to defense counsel, who was allotted time to interview Ms. Elmore prior to her testimony. (Trial Tr. Vol. 14, 1509). Ms. Elmore's testimony was admitted at trial.

The Court notes that the erroneous evidentiary rulings of the State court form a basis for federal habeas relief "only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair." *Gochicoa v. Johnson*, 118 F.3d 440, 446 (5th Cir. 1997). When a trial is fundamentally unfair, the Due Process Clause is violated. *See Cupit v. Whitley*, 28 F.3d 532, 536 (5th Cir. 1994). An unfair trial is one which is "largely robbed of dignity due a rational process." *Johnson v. Blackburn*, 778 F.2d 1044, 1050 (5th Cir. 1985) (citation omitted).

The Court determines Petitioner's contention is without factual basis. The trial judge found Ms. Elmore's testimony admissible, as it showed Petitioner possessed the murder weapons less than a week before the murders. Petitioner has not demonstrated that the trial court's admittance of this evidence was in error.[17] Furthermore, Petitioner has failed to demonstrate Ms. Elmore's testimony was surprise testimony that denied him an opportunity to put the testimony to adversarial testing. Ms. Elmore's name was read at voir dire as one of the witnesses likely to be called in this case. (*See* Trial Tr. Vol. 10, 837). Even though defense counsel did not invoke

---

[17] The Court notes that while "prior bad act" evidence is inadmissible as a general rule, "[e]vidence of other crimes, wrongs, or acts is . . . admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M.R.E. 404(b).

discovery, defense counsel was made aware of the State's intent to put Ms. Elmore on the witness stand, defense counsel was given a copy of her statement to police, and defense counsel was allotted time to interview her prior to the giving of testimony. Petitioner has not demonstrated that he is entitled to relief on this claim.

D.    *Biblical Argument*

Petitioner asserts the prosecutor improperly encouraged the jurors to rely upon biblical teachings and impose the death penalty as an automatic punishment for murder. (Pet. 54-55). Petitioner maintains that the prosecutor's repeated recitation of Bible passages was meant to establish that the Bible's teachings, rather than the court's instructions, were the appropriate considerations in this case. (Pet. 55). This issue was raised on direct appeal as issue XXI and was summarily dismissed by the Mississippi Supreme Court. *See Simon II*, 688 So.2d at 795.

During the State's closing, the prosecutor cited Bible passage Genesis 9:6, which he quoted as, "[w]hoever sheds man's blood by man shall his blood be shed." (Trial Tr. Vol. 15, 1840). This passage was quoted during the prosecutor's explanation of the origination of laws and their purposes. (*See* Trial Tr. Vol. 15, 1839-40). During defense counsel's closing argument, counsel stated that Christianity taught that killing to show disapproval with killing is nonsensical. (Trial Tr. Vol. 15, 1844-45).[18] In rebuttal, the State argued that the Bible prohibited unlawful murder, not death itself, and that it taught that a man reaps what he sows. (Trial Tr. Vol. 15, 1856).

---

[18]  Defense counsel referenced the biblical commandment of "Thou shalt not kill" and illustrated his point by noting that the biblical character, Cain, was exiled rather than killed for murdering his brother. *See* Trial Tr. Vol. 15, 1844-45. Counsel also argued to the jurors that "[w]hen we s[et] ourselves up to do. . . an irreversible thing, then we are setting ourselves up . . . to be God." *See* Trial Tr. Vol. 15, 1850.

The United States Supreme Court has not addressed the propriety of biblical references during closing argument at the sentencing phase of a capital murder case. Therefore, the issue before the Court is whether Petitioner's sentencing proceeding was rendered fundamentally unfair by the prosecutor's comments. *See*, *e.g.*, *Cobb v. Wainwright*, 609 F.2d 754, 755-56 (5th Cir. 1980) (citation omitted). In this case, the jury was properly charged to consider the evidence before it in rendering a decision, and the prosecutor's comments, made without objection, were countered by defense counsel's closing argument. *See Darden v. Wainwright*, 477 U.S. 168, 182, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) (fairness inquiry takes into account the nature of the comments, the evidence before the jury, argument of opposing counsel, jury's charge, and whether error isolated or repeated); *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974); *see also Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982) (finding that the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Petitioner has failed to persuade the Court that Petitioner's trial was rendered unfair by the statements of the prosecutor, particularly when considered in light of the proper jury charges and defense counsel's own biblical references. This claim does not warrant relief.

E.     *Other arguments during sentencing phase*

Petitioner argues that the prosecutor argued inflammatory "factual" scenarios about how the crime occurred, and that these "facts," not in evidence, misinformed and misdirected the jurors on the law. (Pet. 55-56). Petitioner argues that the prosecutor stated Gregory Parker had heard his mother being shot and yelled out, that Mr. Parker saw what was done to his son, that Gregory Parker cried when he saw what was done to his father, and that the victims were held

62

captive for over two hours. (Pet. 56). Petitioner argues the prosecutor again improperly made a biblical argument, stating that only victims could "turn the other cheek." (Pet. 56). This claim was presented to the Mississippi Supreme Court on direct appeal as Issue XXI, and it was summarily dismissed. *See Simon II*, 688 So.2d at 795.

In response to defense counsel's argument that the only purpose for executing Petitioner would be an act of revenge, the prosecutor stated:

> Revenge? We're charged with seeking revenge, and that's the only reason we're up here is here seeking revenge? How trite. How very trite. You're being asked, and how many of you will turn the other cheek of Bobbie Jo Parker? How many of you will turn the other cheek of 12 year old Gregory? And of Carl Parker? You can't turn their cheek. They're gone and they've been murdered, brutally murdered, and the Defendant in this case has argued to you that Robert Simon was doomed from the day that he was arrested, that's what he said, he was doomed from the day he was arrested. Ladies, these three people were doomed from the time that they came home from church and pulled innocently into that carport and opened that door and went up there and turned that key to walk in their house and walked in there to find two men in there with pistols who for a period of probably two and a half hours did no telling what, and I don't even [know] what to think about what took place, but you can't help but do it. And a 12 year old boy was tied up with his arms behind his back lifted high up where he felt pain . . . and his daddy within a few feet of him tied similarly, and when was it when his mother in that back bedroom was shot in the chest, and was he alive at that time, did he hear that shot? . . . . Did Carl Parker hear that shot back there and did he see what was being done to his son right there within a few feet of him . . . and that little boy cried, can you imagine that?" (Trial Tr. Vol. 15, 1854-55).

This Court must view the prosecutor's statements in context of the entire trial to determine whether his comments rendered Petitioner's trial unfair. *See Cobb v. Wainwright*, 609 F.2d 754, 755-56 (5th Cir. 1980). At the time the prosecutor made the above statements, Petitioner had already been found guilty of murdering three people. Defense counsel did not object during the prosecutor's statements, and the prosecutor's statements cited above were made in direct reference to defense counsel's comments that the imposition of the death penalty only served the

purpose of revenge. (*See* Trial Tr. Vol. 15, 1848-49).   The jury heard evidence that Carl and

Gregory Parker were bound prior to their deaths, and the victims were shot with two different

weapons.   The prosecutor was clearly speaking in hypothetical terms about what the jury might

infer from the evidence presented.   Moreover, Petitioner has not demonstrated that the jury

would have reached a different verdict absent the remarks.   Petitioner has failed to demonstrate an

entitlement to relief on this issue.

## IV.  Statement to Police

Petitioner maintains that he gave a statement to police which was obtained (1) as the result

of coercion; (2) without Miranda waivers; and (3) after an unreasonable delay in bringing him

before a magistrate and appointing counsel.  (Pet. 27).  Petitioner asserts that he was arrested in

Clarksdale, Mississippi, on Saturday, February 3, 1990, at approximately 3:30 p.m., and held at

the Clarksdale Police Station until Sunday morning.  (Pet. 27).   He was then transported to the

Coahoma County Jail, where he remained until he was transferred to Quitman County on Sunday

afternoon. (Pet. 27).  Petitioner maintains he was not allowed to see his family or an attorney until

Monday.  (Pet. 27).  He argues that at 10:00 a.m. on Monday morning, he was not brought before

a judge, even though Anthony Carr and Willie Lee Henderson[19] were brought in for their initial

appearances at that time.  (Pet. 27).  Petitioner asserts that the delay was solely for the purpose of

giving police officers an opportunity to interrogate him. (Pet. 28).  His initial appearance occurred

at 1:15 p.m. on Monday, after he had been under arrest approximately forty-six hours.  (Pet. 28).

Petitioner maintains that there was testimony presented at trial that he never requested to

speak to law enforcement officers.  He asserts that Justice Court Judge Bush had been to the

---

[19] Henderson was charged and later released.

Clarksdale Police Department on Saturday evening to sign a search warrant to seize evidence from Petitioner, and that the judge was available to advise Petitioner at that time. (Pet. 28). Petitioner also notes that he refused to sign a waiver of rights form and refused to sign the statement he gave to police officers. (Pet. 29). Petitioner contends that all of these facts should lead to the conclusion that his statement was obtained in violation of his constitutional rights and admitted improperly.

The Mississippi Supreme Court considered this argument on direct appeal as Issue IX, and it was summarily dismissed. *See Simon II*, 688 So.2d at 795. This Court has previously addressed these issues in the context of ineffective assistance of counsel. (*See* I.B. and I.F., *supra*, 22-25, 37-39). In *County of Riverside v. McLaughlin*, 500 U.S. 44, 56-57, 111 S.Ct. 1661, 1670, 114 L.Ed.2d 49 (1991), the Supreme Court held that a person detained by a warrantless arrest must receive a judicial determination of probable cause within forty-eight hours or the State must demonstrate "the existence of a bona fide emergency or other extraordinary circumstance" for failing to secure a determination for the detained.[20] Prior to forty-eight hours, the burden is on the defendant to show that the delay was unreasonable. *Id.* The Court determined that the requirement of a "prompt" judicial determination might nevertheless be violated within the forty-eight-hour window if there was unreasonable delay in bringing the defendant before a magistrate. The Court determined:

> Examples of unreasonable delays are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting

---

[20] *McLaughlin* addressed what constituted a "prompt" judicial determination under *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities. *Id.* at 56-57, 111 S.Ct. at 1670.

In the case *sub judice*, Petitioner was taken before a judicial officer within forty-eight hours of his arrest. He was arrested on a Saturday, and law enforcement officers were conducting investigations in no fewer than three cities at that time. Petitioner had to be arrested, processed, and transferred to Quitman County where the crimes occurred. Moreover, Petitioner has made no argument to this Court that even if he was detained for an hour on Monday solely for the purpose of being interviewed prior to his initial appearance that such a detainment would be constitutionally infirm. He was arrested pursuant to a warrant. *See McLaughlin*, 500 U.S. at 56, 111 S.Ct. at 1670 (finding an example of unreasonable delay a delay "for the purpose of gathering additional evidence *to justify the arrest*") (emphasis added). (*See*, *e.g.*, Trial Tr. Vol. 11, 1041; Trial Tr. Vol. 12, 1222; Trial Tr. Vol. 13, 1347). Petitioner has not demonstrated that he is entitled to relief on the sub-issue of delay.

Prior to a custodial interrogation, a suspect must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning" as a prerequisite to the admissibility of an inculpatory statement. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). Law enforcement need not necessarily obtain a written or oral statement of waiver in order for a waiver of these rights to be valid. See *North Carolina v. Butler*, 441 U.S.369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979) (waiver indicated by accused's statement that he wished to talk though he would not sign anything). The trial court clearly found Petitioner's statement to law

enforcement to have been knowingly and voluntarily given after conducting a hearing on the issue. There is more than adequate support in the record that Petitioner was read his *Miranda* warnings and fully understood his rights. (*See* Trial Supp. Vol. 2, 284-85, 387; *see also* Trial Tr. Vol. 12, 1100, 1233, 1238-39; Trial Tr. Vol. 13, 1313; Trial Tr. Vol. 14, 1612-13). Petitioner has not demonstrated that relief on this claim is warranted.

## V.  Conflicted Expert

Petitioner's counsel retained the assistance of psychologist Dr. William Kallman, who was already serving as an expert for Anthony Carr and held duties that Petitioner asserts conflicted with his interests. He argues this retention of a conflicted expert denied him the assistance of an expert as guaranteed by the United States Constitution. (Pet. 47).

The Mississippi Supreme Court addressed this issue on post-conviction review in the context of an ineffective assistance of counsel claim. *See Simon III*, 857 So.22d at 685. The Court has addressed the facts and record in that context and determined Petitioner has not demonstrated that he was actually prejudiced as a result of Dr. Kallman's assistance. (*See* Part I.E., *supra*, 34-36). The Court does not determine that Dr. Kallman's dual assistance per se prejudiced Petitioner as he would have the Court find. As previously noted, whatever tendencies Carr possessed do not negate Petitioner's own culpability in these crimes. That Petitioner might have been "kinder" while stealing the weapons later used in the Parker murders is of little consequence, and such testimony would have only served to allow cross-examination of Petitioner's leadership role in the relationship between himself and Carr.

Petitioner has offered no support for his claim that the denial of the effective assistance of an expert witness violates his constitutional rights, and this Court does not find any Supreme Court precedent that would support such a view. *See Mitchell v. Esparza*, 540 U.S.12, 17, 124

S.Ct. 7, 11, 157 L.Ed.2d 263 (2003) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous."); *see also Campbell v. Polk*, 447 F.3d 270, 285-86 (4th Cir. 2006) (finding no constitutional entitlement to effective assistance of expert witness). Petitioner has not shown that a right exists to the effective assistance of an expert witness, nor has he established that he was prejudiced as a result of Dr. Kallman's assistance. Relief on this claim is not warranted.

## VI.  Voir Dire

Petitioner maintains that the trial court erred in failing to conduct and preventing trial counsel from conducting voir dire of prospective jurors who expressed reluctance to impose the death penalty sufficient to determine whether their views would substantially impair their ability to follow the court's instructions and fulfill their duties as jurors. (Pet. 47). Petitioner asserts that the trial court allowed jurors to be removed for cause on the basis that they "did not believe in" the death penalty, even though they did not indicate they would not follow the court's instructions. (Pet. 47-48). Specifically, Petitioner states that Ms. Arlettie Williams (juror 72) and Ms. Cheryl Massey (juror 91) were improperly excused, and that defense counsel was not given an opportunity to question these jurors on their views. (Pet. 48).

The Mississippi Supreme Court considered this claim on direct appeal, and it noted  that defense counsel raised an objection to the trial court excusing four jurors based on their opposition to the death penalty. *Simon II*, 688 So.2d at 799. The court found that "the record reflects that each of the four venire members affirmatively stated that they were opposed to the death penalty, would not consider the death penalty, and would not impose it."[21] *Id.*  at 799-800.

---

[21] On direct appeal, Petitioner argued this claim as to potential jurors: (1) Ms. Williams (juror no. 72); (2) Ms. Massey (juror no. 91); (3) Ms. Etheridge (juror no. 23); and (4) Ms.

The court determined that the precedent of the United States Supreme Court established that a juror "irrevocably committed to vote against the death penalty regardless of the facts and circumstances" could properly be struck, and the court determined Petitioner's argument was without merit. *Id.* at 801.

A review of the record yields that defense counsel's attempt to rehabilitate jurors was not cut-off prematurely. The trial court allowed the prosecution to voir dire the prospective jurors about their views of the death penalty, and the defense was allowed the same opportunity. (*See* Part I.A., *supra*, 21). During defense counsel's voir dire, potential jurors who believed in capital punishment were asked to raise their hands. Everyone on row eight with the exception of Ms. Massey raised their hands. (Trial Tr. Vol. 11, 950). Later, defense counsel asked persons "that do not believe in the death penalty" to raise their hands. (Trial Tr. Vol. 11, 958). Ms. Williams and Ms. Massey raised their hands. (Trial Tr. Vol. 11, 959-60). After noting all potential jurors who stated they did not believe in inflicting death as a means of punishment, defense counsel asked whether these persons could "follow the Judge's instructions if you're selected as a juror in this case and decide the guilt or innocence of this Defendant . . . regardless of your feelings about the death penalty, can you listen at the evidence and follow the Judge's instructions and vote whether you believe the person is guilty or not guilty without thinking about any penalty, can you do that?" (Trial Tr. Vol. 11, 960-61). Defense counsel asked each individual who raised his or her hand in response to the question whether they could render a decision without thinking about the penalty. Ms. Williams stated that she could. (Trial Tr. Vol. 11, 963-64). Defense counsel asked whether the potential jurors could "decide the guilt or innocence of the person without

Hinson (juror no. 104). In his habeas petition, Petitioner only raises this claim as to potential jurors Williams and Massey.

considering the penalty, not to say you wouldn't think about it, without considering the penalty as part of your decision making process on whether a person is guilty or not?"  (Trial Tr. Vol. 11, 964).

Later, defense counsel stated that  "[y]ou all understand that a cross section of the community includes people who believe in the death penalty and people who do not believe in the death penalty.  Do you understand that?" (Trial Tr. Vol. 11, 965).  The judge sustained the prosecution's objection to that question.  (Trial Tr. Vol. 11, 965).  Defense counsel immediately followed up that question by asking whether the persons who indicated that they did not believe in the death penalty could still "follow the law and consider whether or not [the death penalty] is appropriate or not, even though you don't believe in it."  (Trial Tr. Vol. 11, 966).  After the prosecution lodged an objection, the trial court stated "[t]he Court has asked this question, Mr. Walls, and this is the third different way that you've asked the same question.  I'm sustaining the objection."  (Trial Tr. Vol. 11, 966).  Later, during challenges for cause, the trial court excused both Ms. Williams and Ms. Massey on the basis that they stated they could not consider the death penalty.  (Trial Tr. Vol. 11, 984-85, 986).

Jurors may not be excused from being seated on a capital jury merely because they have general objections to the imposition of the death penalty.  *See, e.g.*, *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).  Courts must determine  "[w]hether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (citation omitted).  A reviewing court must acknowledge that the bias of a prospective juror "involves credibility findings whose basis cannot be easily discerned from an appellate record."  *Witt*, 469 U.S. at 429, 105 S.Ct. at 855.   While Petitioner would have this

Court find Ms. Williams's comment that she could consider the issue of guilt or innocence

without regard to the penalty decisive of this claim, a juror who can not or will not impose the

death penalty can not perform his or her oath as a juror in the sentencing phase of a capital case.

*See, e.g., Uttecht v. Brown*, ___ U.S. ___, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007) ("[A]

juror who is substantially impaired in his or her ability to impose the death penalty under the

state-law framework can be excused for cause."). Petitioner has failed to demonstrate that he is

entitled to relief on this claim.

### VII. Jury Instructions: Guilt and Sentencing

*A. Lesser-Included Offense & Deliberate Design Instruction at Guilt Phase*

Petitioner maintains that the jury instruction on lesser-included offenses improperly

discouraged jurors from considering lesser-included options in violation of his Eighth and

Fourteenth Amendment rights. (Pet. 49). Specifically, he objects to the instruction's language

that the lesser-included option "is not designed to relieve you from the performance of an

unpleasant duty." (Pet. 49). Petitioner also maintains that the "deliberate design" instruction

"erroneously invited the jury to find that deliberate design was formed at the very moment of a

fatal act." (Pet. 50). This claim was presented on direct appeal as Issue XVII, and it was

summarily dismissed. *Simon II*, 688 So.2d at 795.

The lesser-included instruction was given to the jury as:

The Court instructs the jury that if warranted by the evidence, you may find the
Defendant guilty of a lesser crime than capital murder in any one or more of the
three counts. However, not withstanding this right, it is your duty to accept the
law as given to you by the Court, and if the facts and law warrant a conviction for
the crime of capital murder, then it is your duty to make such finding, uninfluenced
by your power to find a lesser offense. This provision is not designed to relieve
you from the performance of an unpleasant duty. It is included to prevent a failure
to justice if the evidence fails to prove the original charge of capital murder and
any one or more of the three counts, but does justify a verdict for the lesser crime

of murder in any one or more of the counts.  (Trial Tr. Vol. 14, 1662-63).

The deliberate design instruction was read to the jury as:

The Court instructs the jury that 'deliberate design' as used elsewhere in these
instructions means intent to kill, without authority of law and not being legally
justifiable or legally excusable.  A deliberate design cannot be formed at the very
moment of the fatal act; however, the deliberate design need not exist in the mind
of the Defendant for any definite time nor for hours, days or even minutes, but if
there is deliberate design, and it exists in the mind of the Defendant but for an
instant before the fatal act, that is sufficient deliberate design to constitute the
offense of capital murder or murder.  (Trial Tr. Vol. 14, 1657).

Federal habeas relief does not generally lie on the basis of improper jury instructions

given at trial.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385

(1991).  Relief only lies where the instruction by itself so infected the entire trial that the

conviction that resulted violates due process.  *Id.* at 72, 112 S.Ct. at 482.  Although Petitioner

cites to *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) in his direct

appeal brief in support of his argument regarding the lesser-included option instruction, Petitioner

offers this Court no specific argument why the language of this instruction is error.  In *Beck*, the

United States Supreme Court held that a capital jury must be allowed to consider a lesser-

included noncapital offense where the evidence would support that verdict.  *Id.* at 627, 100 S.Ct.

at 2384.  However, the rule of *Beck* is not applicable where the jury was instructed on a lesser-

included offense.  *See Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 3159, 82 L.Ed.2d

340 (1984) (*Beck* rule designed to eliminate distortion in process when jury only choice is

between guilt and innocence).  Petitioner has not demonstrated that he is  entitled to relief on the

basis of the lesser-included offense instruction given at trial.

 With regard to the "deliberate design" instruction, it would appear from the record that

there was no disagreement between defense counsel and the State about the propriety of the instruction. (*See* Trial Tr. vol. 14, 1599-1600). Moreover, the instruction specifically states that deliberate design cannot be formed at the very moment of the fatal act. Petitioner has not demonstrated that he is entitled to relief on the basis of the "deliberate design" instruction given at trial.

B.      *Heinous, Atrocious, or Cruel Instruction*

Petitioner maintains that the "heinous, atrocious, or cruel" instruction was overly broad and vague in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. (Pet. 50). Petitioner asserts this is a "grab-bag" instruction of contradictions and alternative definitions, allowing the jury to see each possible definition as a sufficient alternative to prove this aggravating circumstance. (Pet. 50). Petitioner maintains that the first two sentences of this portion of the charge have been explicitly invalidated by the United States Supreme Court, and that the third part invites the jury to find the aggravator based on damage to the victims' bodies after their death. (Pet. 51). Petitioner argues there was no evidence about the victims' last moments and no evidentiary basis for concluding there was mental torture and aggravation before death. (Pet. 51).

This issue was raised on direct appeal as Issue XVIII(D) and summarily dismissed. *See Simon II*, 688 So.2d at 795. The instruction as given reads:

> The Court instructs the jury that in considering whether the capital offense was especially heinous, atrocious or cruel; heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.
>
> An especially heinous, atrocious or cruel capital offense is one accompanied by a such additional acts as to set the crime apart from the norm of murders–the conscienceless or pitiless crime which is unnecessarily tortuous to the victim. If you find from the evidence

beyond a reasonable doubt that the defendant caused serious mutilation, that the defendant inflicted physical or mental pain before death, or there was mental torture and aggravation before death, then you may find this aggravating circumstance. (SCP Vol. 4, 692); (Trial Tr. Vol. 15, 1817).

During an in-chambers jury instruction conference, the prosecution presented two differing versions of this instruction. (Trial Tr. Vol. 15, 1817). Defense counsel objected to both instructions, and the trial court went through the instructions, striking the language not supported by the evidence. The trial court stated that "there is testimony as to the loss of Mr. Parker's finger, so that - - where there would be a question of serious mutilation. There was no dismemberment of the body prior to death so that would not apply. " (Trial Tr. Vol. 15, 1817). The trial judge also mentioned that he did not believe there was "a lingering or tortuous death" suffered, though "[t]here conceivably could have been mental torture and aggravation before death, we don't really know, though." (Trial Tr. Vol. 15, 1818). The State remarked that Dr. Hayne's testimony gave evidence that the way the victims were tied would have brought about physical pain, as well as the fact that "the boy" was shot through the arm. (Trial Tr. Vol. 15, 1818). After discussion, the trial court determined that mental torture and aggravation was plausible given the fact that the victims were tied up and shot, and one could infer that some of victims had to witness the others being killed. (Trial Tr. Vol. 15, 1820). Judge Pearson allowed the instruction as modified, and defense counsel reiterated his objection to any language of mutilation being in the instruction. (Trial Tr. Vol. 15, 1821).


In *Shell v. Mississippi*, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), the United States Supreme Court found language like that in the first paragraph of this instruction, when used alone, was constitutionally infirm. However, when used in conjunction with a proper limiting

instruction, the instruction is constitutionally permissible. *See Bell v. Cone*, 543 U.S. 447, 453-60, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005) (constitutional infirmity in aggravator cured by valid narrowing construction); *see also Maynard v. Cartwright*, 486 U.S. 356, 363-65, 108 S.Ct. 1853, 1859-60, 100 L.Ed.2d 372 (1988) (limiting instruction referring to physical torture or serious injury could cure insufficiency). Petitioner has not demonstrated that the limiting language was insufficient to properly narrow the instruction, and he is not entitled to relief on this issue.

C.      *Failure to Instruct Jury That Unanimity in Mitigating Circumstances Not Required*

Petitioner maintains it was error for the trial court not to instruct the jury that it was not required to unanimously find the existence of mitigating circumstances to give them effect. (Pet. 51). This issue was presented to the Mississippi Supreme Court as Issue XVIII(D) on direct appeal and was summarily dismissed. *Simon II*, 688 So.2d at 795.

The United States Supreme Court has found that "each juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy v. North Carolina*, 494 U.S. 433, 442-43, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990). A sentencing instruction which creates a substantial likelihood that a juror might believe they are precluded from considering any mitigating evidence unless all jurors agree on the existence of a particular mitigating circumstance is invalid. *See Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

In this case, there were no instructions given to the jury limiting their consideration of mitigating circumstances. Unlike the jury instructions in *Mills* or *McKoy*, the jury in this case was not instructed they had to agree on the existence of mitigating circumstances. The instructions in this case properly allocated to the State the burden of proving the aggravating circumstances, and the instructions were not misleading. (*See* Trial Tr. Vol. 15, 1824-1837).

Petitioner has not demonstrated that this claim warrants relief.

D.      *Refusal to give statutory mitigating circumstance instruction*

Petitioner asserts it was error for the trial court to refuse to instruct the jury as to his lack of a substantial prior criminal history.  (Pet. 53).  This issue was raised as direct appeal Issue XVIII(a), and it was summarily dismissed by the Mississippi Supreme Court.  *See Simon II*, 688 So.2d at 795.   Pursuant to Mississippi law, a criminal defendant may be entitled to an instruction of the statutory mitigating circumstance that he "has no significant history of prior criminal activity" if warranted by the evidence.  *See* Miss. Code Ann. § 99-19-101(6)(a).

The trial court refused Petitioner's proposed instruction without comment and to no objection.  (*See* Trial Tr. Vol. 15, 1823; *see also* State Court Papers Vol. 4, 735, Proposed Instruction No. CR-90-278 D-S-12).  Petitioner makes no argument that he presented evidence of a lack of substantial prior criminal history.  *See, e.g,  Delo v. Lashley*, 507 U.S. 272, 275, 113 S.Ct. 1222, 1224, 61 L.Ed.2d 620 (1993) ("[T]he sentencer must be allowed to consider in mitigation 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'").  Petitioner is not entitled to relief on this issue.

## VIII.   Photographs & Display

Petitioner maintains that the repeated introduction of "gruesome photographs" and an "emotional display" by family members of the victims combined to deprive him of his due process rights and his right to a reliable sentencing determination.  (Pet. 52).  This issue was raised as Issue X on direct appeal and summarily dismissed.  *See Simon II*, 688 So.2d at 795.

Petitioner argues that over defense counsel's objection, the prosecution offered autopsy photographs showing how fire had burned the victims bodies, and that the pathologist was

allowed to testify that the victims' bodies had been incinerated. (Pet. 52). He maintains that photographs were presented of the victims in life and then after they were discovered, leading to an emotional outburst by the victims' family. (Pet. 52). Defense counsel immediately moved for a mistrial and was denied. (Pet. 52)

An evidentiary ruling of the State court is cognizable in federal habeas corpus only if the admission of the evidence denied Petitioner a fundamentally fair trial. *See, e.g., Woods v. Estelle*, 547 F.2d 269 (5th Cir. 1977). The introduction of photographic evidence does not generally deprive a defendant of a fair trial. *See, e.g, United States v. Bowers*, 660 F.2d 527, 529-30 (5th Cir. 1981)(color photograph of child's lacerated heart necessary to government's burden of showing cruel and excessive physical force); *Nettles v. Wainwright*, 677 F.2d 410, 414-15 (5th Cir. 1982); *Cronnon v. Alabama*, 587 F.2d 246, 250-51 (5th Cir. 1978). In the instant case, the trial court found that photographs of the victims as they were found were relevant to the jury's role in determining whether aggravating circumstances existed, and the trial court did not find them inflammatory with regard to the injuries to the victims. (*See* Trial Tr. Vol. 15, 1731, 1741-42). Petitioner has not demonstrated that the probative value of these photographs was so exceeded by their inflammatory nature as to violate due process.

Petitioner asserts that the combined effect of the introduction of the photographs with the emotional display of a member of the victims' family deprived him of a fair sentencing determination. During the course of the trial, defense counsel brought it to the court's attention that members of the victims' family were sitting on the front row weeping. (Trial Tr. Vol. 15, 1734). The trial judge stated he had not personally observed the behavior but called a recess so that the prosecutor could caution the family members and move them out of the line of sight of

77

the jury. (Trial Tr. Vol. 15, 1734-35). The trial court determined that any display that had been made was not significant enough to warrant a mistrial. (Trial Tr. Vol. 15, 1735-36, 1746-49). The trial judge took measures to limit any prejudice to Petitioner, and the behavior complained of by defense counsel was obviously not significant enough to catch the attention of the trial judge or the prosecutor. Petitioner was not denied a fair sentencing proceeding as a result of this complained of action, and this claim does not warrant relief.

## IX. Double Jeopardy & Collateral Estoppel

Petitioner maintains that he was tried twice for the same conduct, in violation of the prohibition against Double Jeopardy embodied in the Fifth and Fourteenth Amendments to the United States Constitution. (Pet. 56-57). Petitioner raised this argument on direct appeal as Issue VI, and it was summarily dismissed. *Simon II*, 688 So.2d at 795. On post-conviction review, the Mississippi Supreme Court found the death sentences did not implicate or violate Double Jeopardy. *Simon III*, 857 So.2d at 699.

Petitioner argues that he was indicted in four separate indictments for the murder of the Parker family. He received a life sentence as a result of a trial on one of those indictments, and then he was re-indicted in one three-count indictment for the remaining murders. (Pet. 56-57). He argues, therefore, that he was tried and retried for the same conduct for which he had previously been prosecuted and sentenced. (Pet. 57).

On post-conviction review, the Mississippi Supreme Court noted that the cases relied upon by Petitioner in support of his argument were distinguishable from the facts of his case. *Simon III*, 857 So.2d at 699. The court noted that in *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), a defendant who was sentenced to 50 years to life imprisonment whose guilty verdict was later overturned could not be sentenced to death upon

retrial because the first jury unanimously sentenced him to a lesser sentence. *Simon III,* 857 So.2d at 699-700. Similarly, in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), where a defendant was found not guilty on the first of several separate trials for multiple murders arising from one armed robbery, he could not subsequently be tried for other murders during the robbery where the evidence was the same and the jury had previously acquitted him. *Simon III*, 857 So.2d at 700.

The Mississippi Supreme Court noted Petitioner's first conviction was not reversed by the court, nor did the jury unanimously sentence him to life imprisonment. *Id.* Rather, he was sentenced to life only after the jury deadlocked on punishment. *Id.* The inability to decide did not "acquit" him of the death penalty. *Id.* The court noted the facts of Petitioner's case are more similar to *Rodden v. Delo*, 143 F.3d 441 (8th Cir. 1998), where a defendant tried separately for two murders, receiving a life sentence in one and a death sentence in the other, argued "that collateral estoppel prevented the second jury from relitigating the issue of capital punishment." *Simon III*, 857 So.2d at 700. There, the Eighth Circuit, determined that "[t]he Double Jeopardy Clause protects against multiple punishments for the same offense, but does not prevent a state from selecting independent penalties for separate crimes." *Id*. at 700 (citations omitted). The Mississippi Supreme Court determined each murder was a separate offense, and the underlying felonies were different for each victim, such that Double Jeopardy was not implicated.[22] *Id*. at 701.

Respondents maintain each murder was a separate crime and argue that Petitioner was not

---

[22] In *Simon I,* rape was the underlying felony. In *Simon II*, the State had to prove the underlying felony of kidnapping Gregory Parker, robbery of Carl Parker, and burglary of Bobbie Joe Parker's home.

acquitted of the death penalty in the first trial. (R. Memo 129). Respondents also note that in *Sattazahn v. Pennsylvania*, 537 U.S. 101, 109-115, 123 S.Ct. 732, 738-741, 154 L.Ed.2d 588 (2003), the United States Supreme Court found that there was no prohibition against seeking the death penalty in a second trial for the same murder after a jury deadlocked on sentencing in the first trial. As the defendant in that case was never "acquitted" of the death penalty in his first trial, "jeopardy" was not terminated. *Id.* at 113, 123 S.Ct. at 740.

Double jeopardy prohibits a State from attempting to punish the same offense twice. *Witte v. United States*, 515 U.S. 389, 396, 115 S.Ct. 2199, 2204, 132 L.Ed.2d 351 (1995). Each murder Petitioner committed was a separate punishable offense. *See Miller v. Turner*, 658 F.2d 348, 250 (5th Cir. 1981) (argument that double jeopardy violated when defendant charged with two murders occurring during same criminal episode rejected as "frivolous"). Relief on this issue is not warranted.

## Conclusion

For the reasons set forth above, Petitioner has not demonstrated that the State court's denial of relief as to any of claim presented to it was contrary to, or involved an unreasonable application of, clearly established federal law, nor has the denial been shown to have been based on an unreasonable determination of facts in light of the evidence presented in the State court proceedings. Accordingly, the Court **DENIES** federal habeas relief, and the instant petition shall be dismissed with prejudice. A separate order in accordance with this opinion shall issue today.

**THIS**, the 30th day of November, 2007.

/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE